696 P.2d 185

**NEW PUEBLO CONSTRUCTORS, INC.,
Plaintiff/Appellee,**

v.

**STATE of Arizona,
Defendant/Appellant.**

No. 17581–PR.

Supreme Court of Arizona,
En Banc.

Feb. 27, 1985.

Lewis & Roca by John P. Frank, Joseph E. McGarry and Sarah H. Jenkins, Phoenix, for petitioner/appellee.

Robert K. Corbin, Atty. Gen. by James L. Hohnbaum, Joe Acosta, Jr. and Albert Morgan, Asst. Attys. Gen., Phoenix, for respondent/appellant.

Shimmel, Hill, Bishop & Gruender by Daniel F. Gruender and Kenneth C. Sundlof, Jr., Phoenix, for amicus curiae Associated General Contractors.

Fennemore, Craig, von Ammon, Udall & Powers by Calvin H. Udall and Rolf R. von Oppenfeld, Phoenix, for amici curiae W.R. Skousen Contractor, Inc.; C.S. McCrossan, Inc.; D.C. Speer Const. Co., Inc.; Clinton Campbell Contractor, Inc.

HAYS, Justice.

Plaintiff-petitioner, New Pueblo Constructors (NPC), entered into two contracts with defendant-respondent, the Arizona Department of Transportation (ADOT), to construct two adjoining segments of the interstate highway between Nogales and Tucson, known as the "Carmen" and "Tubac" projects. In the fall of 1977 and the spring of 1978, a catastrophic storm and unusually heavy rainfall caused extensive damage to both project areas and to work previously performed by NPC. NPC requested compensation for the additional costs in completing the work under a clause in both contracts that relieved the contractor of added expense caused by acts of God and other unforeseeable events beyond its control. NPC also sought to recover $31,500 assessed against it as liquidated damages for late completion of the Tubac project. After exhausting administrative remedies, NPC sued ADOT. On January 20, 1983, the jury returned a verdict of $256,891.23 in NPC's favor. This amount included both compensation for NPC's losses and a complete refund of money paid as liquidated damages. The trial court also awarded NPC $42,192 in attorney's fees and $17,792.94 in expert witness fees under A.R.S. § 12–348(A)(3). The Court of Appeals reversed the trial court with respect to all relief granted below and remanded the case for further proceedings. *New Pueblo Constructors, Inc. v. Arizona Department of Transportation,* —— Ariz. ——, 696 P.2d 203 [1984]. We have jurisdiction. Ariz. Const. art. 6, § 5(3); Ariz.R.Civ. App.P., Rule 23; A.R.S. § 12–120.24. Amicus curiae, Associated General Contractors of Arizona and W.R. Skousen, contractors, were granted leave to file briefs in support of the petition for review. We accepted NPC's petition for review to address six questions:

1. Did the contractor fail as a matter of law to provide adequate notice of a claim for additional compensation in completing the contract?

2. Did ADOT's engineer have absolute discretion to refuse to waive liquidated damages, thereby barring submission of this issue to the jury?

3. Did the measurement of the contractor's damages for extra work by the modified total cost method and the jury verdict method rather than by isolating actual costs bar relief?

4. Does A.R.S. § 12–825 bar an award of attorney's fees or taxable costs against the state?

5. May a contractor recover attorney's fees under A.R.S. § 12–348(A)(3) for *de novo* review of a contract dispute?

6. May a contractor recover attorney's fees in a contract action against the state under A.R.S. § 12–341.01?

We vacate the court of appeals opinion. We dismiss ADOT's cross-petition to review the Court of Appeals determination that the statute of limitations has not run on NPC's claim. The relevant facts are discussed in our presentation of the issues.

## I. DID THE CONTRACTOR PROVIDE NOTICE OF HIS CLAIM FOR COMPENSATION?

The work performed by NPC on the Carmen and Tubac projects involved, first of all, grading and draining the roadbed to form the "subgrade" (or graded roadbed). The "base" and "paving materials" would then be placed on the subgrade to form the

highway. The "base" materials consist of rock of various sizes which is compacted into the subgrade. "Paving" or surface materials are a combination of asphalt and "mineral aggregate" (a mixture of various sizes of rock and sand) which is spread over the base layer of the roadway. Special backfill material was used in providing support for bridges and other construction. The contractor's original sources for the base, paving and special backfill materials were the Anamax and the Agua Linda aggregate mining pits near the Santa Cruz River.

On October 9 and 10, 1977, an extraordinary storm, part of Hurricane Heather, struck southern Arizona. This "hundred years" storm caused the biggest flood and runoff experienced in the area for 43 years. The governor declared a state of emergency for Pinal, Pima and Santa Cruz Counties, which included the area of these projects. This storm was followed by unusually heavy rainfall during the first few months of 1978.

The weather caused extensive damage to the highway project area. The soil in the project area became unstable; the ground below became so soft that heavy construction equipment sank in mudholes fed by groundwater. The subgrade was softened and had to be stabilized and the roadway refilled. Base material previously placed on the roadway became oversaturated and had to be removed and replaced. Stockpiled base and special backfill material in the Anamax pit eroded and washed away. The groundwater table in the Agua Linda pit ultimately rose from a level of 30 feet to 12 feet below the surface. As a result, a new section of the Agua Linda pit had to be developed for mineral aggregate and additional base material had to be excavated, crushed and hauled.

ADOT had actual knowledge of the adverse and continuing effects of the weather on the project. On November 4, 1977, ADOT sought and obtained a declaration by the federal government that the Santa Cruz River Basin, which included the project site, was a major disaster area. In late December, 1977, Karl Ronstadt, the president of NPC, met with the ADOT supervisor for the Carmen project and informed him of the increased costs of constructing the east frontage road. On December 23, 1977, the president of NPC phoned the state engineer, Oscar Lyons. The two men discussed the gravity of the flooding in the project area, the length and severity of the continuous rains, and the increased costs and delays caused by the weather. In late March or early April of 1978, the management of NPC met with the state engineer to discuss the situation. The state engineer suggested NPC make a claim under subsection 107.17 of the ADOT Standard Specifications for road and bridge construction, which was incorporated as part of both contracts. See *Arizona Department of Transportation Standard Specifications (1969)*, and the 1977 Supplement, (hereinafter referred to as "Standard Specifications"). Subsection 107.17 provides in relevant part that:

> Until final written acceptance of the project by the engineer, the contractor shall have the charge and care thereof and shall take every precaution against injury or damage to any part thereof by the action of the elements or from any other cause, whether arising from the execution or from the nonexecution of the work. The contractor shall rebuild, repair, restore and make good all injuries or damages to any portion of the work occasioned by any of the above causes before final acceptance and shall bear the expense thereof *except damage to the work due to unforseeable [sic] causes beyond the control of and without the fault or negligence of the contractor, including but not restricted to acts of God,* of the public enemy or governmental authorities. (Emphasis added.)

On March 16, 1978, NPC wrote a letter to the ADOT supervisors for the Carmen and Tubac projects. In that letter, NPC advised ADOT that the flooding, unseasonable rains, and rising water table were hampering their operations in the select, mineral aggregate and special backfill pits.

The letter closed by warning that there would be a delay in completing the project. On March 23, 1978, DeWayne Tripp, ADOT project engineer, conceded in his study of the problem that the unusual weather that struck the project area during the six-month period after Hurricane Heather had adversely affected the work. On April 20, 1978, NPC wrote ADOT informing them that it intended to make a claim for compensation under subsection 107.17 for the unforeseeable and uncontrollable damage caused by the flooding and the weather. NPC also informed ADOT that they were compiling costs for this damage and information on the financial impact of the delays. On April 28, 1978, ADOT replied that they did not consider the information presented in NPC's letter to be a sufficient basis for a claim for additional compensation under subsection 105.17 of the Standard Specifications, *supra*. Subsection 105.17 provides in pertinent part that:

> **105.17 Claims for Adjustment and Disputes:**
>
> If for any reason, the contractor deems that additional compensation is due him for work or material not clearly covered in the contract or not ordered by the engineer as extra work, the contractor shall notify the engineer in writing of his intention to make claim for such additional compensation before he begins the work on which he bases the claim. If such notification is not given and the engineer is not afforded proper facilities by the contractor for keeping strict account of actual cost as required, the contractor hereby agrees to waive any claim for such additional compensation....

ADOT closed the letter by stating that until detailed information was presented concerning NPC's losses, there was no point in further discussing their claims for relief. On May 4, 1978, NPC wrote a letter warning ADOT that it intended to press its claims for compensation. NPC also requested ADOT to keep track of costs on the remaining fencing and excavation work (neither of which is a matter of dispute in this lawsuit). On June 27, 1978, NPC submitted an estimate of its claims to ADOT.

At trial, the judge held that NPC could not recover any costs incurred before its first written notice to ADOT of its claims. The issue of the sufficiency of NPC's written notice to ADOT was submitted to the jury. The jury found that NPC's March 16th and April 20th letters would have informed a reasonable person that NPC was performing additional work for which compensation was expected. The Court of Appeals reversed, holding that the notice provided by NPC in these two letters was insufficient as a matter of law to comply with subsection 105.17 governing claims for additional compensation.

We disagree for the reasons that follow. NPC asserts that the notice requirements of subsection 105.17 do not apply to this case. NPC reasons that subsection 105.17 was intended to apply only to claims for additional compensation for "extra work" (work compensable because it is outside the contract and not required in its performance) and not "rework" (work required in the performance of the contract but compensable due to changed conditions or government breach). Section 105.17 is virtually identical to section 105.17 of the *Guide Specifications for Highway Construction (1968)* established by the American Association of State and Highway Transportation Officials. There are no regulations interpreting these provisions, nor any cases directly on point. The court of appeals did not address NPC's contention because NPC did not raise this issue there. We need not reach this contention either. Because NPC did not urge this contention in that court, we deem it waived. *See Iman v. Southern Pacific Co.*, 7 Ariz.App. 16, 19, 435 P.2d 851, 854 (1968). Assuming, without deciding that the notice requirements of section 105.17 apply to rework of the kind involved in this case, we conclude that there was at least a jury question as to whether NPC gave sufficient notice to ADOT of its demand for compensation.

The notice requirement of subsection 105.17 protects important state concerns. It permits early investigation of the validi-

ty of a claim when the evidence is still available and the memories of witnesses have not faded. It allows the agency to compile records of the contractor's costs. Finally, the notice requirement allows the agency to consider alternate methods of construction that may cut costs. *See* Appeal of Leavell & Co., ASBCA 16099, 72–2 BCA 9694 (1972). ADOT maintains that strict enforcement of the notice requirement is essential to further these legitimate state interests. Because we find no harm to these state interests on the facts of this case, we disagree.

■ In the absence of controlling state authority, state courts naturally look for guidance in public contract law to the federal court of claims and the federal boards of contract appeals. *See, e.g., Dewey Jordan, Inc. v. Maryland-National Capital Park & Planning Commission,* 258 Md. 490, 265 A.2d 892, 897 (1970) (where there is a dearth of cases regarding "changes" and "suspension of work" in construction contracts, court notes a vast body of federal cases on point); *Siefford v. Housing Authority of the City of Humbolt,* 192 Neb. 643, 647–48, 223 N.W.2d 816, 819 (1974) (in the absence of Nebraska cases discussing the doctrine of "acceleration," court looks to federal decisions); *Morrison-Knudsen Co. v. State,* 519 P.2d 834, 839–40 (Alaska 1974) (on issue of duty of state to disclose to contractor information in its possession, the state court "takes considerable guidance" from a line of cases developed in the Court of Claims.) *Morrison v. State Highway Commission,* 225 Or. 178, 357 P.2d 389, 392–93 (1960) (in defining what constitutes "changed conditions," the court looks to federal cases.) These specialty courts almost exclusively handle federal procurement and construction cases. *See* 28 U.S.C. § 1346(a) (1976), 28 U.S.C. § 1491 (1972) (court of claims and district courts have concurrent jurisdiction for claims under $10,000; court of claims has exclusive jurisdiction for claims over $10,000). Because of the differences in the size, funding and number of personnel between state and federal agencies, we would not automatically impose the same require-

ments on both kinds of agencies. We believe, however, that the federal cases provide a persuasive answer to the problem posed in the instant case.

■ Barring claims for compensation by a strict application of notice requirements is disapproved by these federal tribunals where the government is aware of the changed conditions and of the claim for compensation and where no prejudice is shown by the lack of formal notice. *See Hoel-Steffen Construction Co. v. United States,* 197 Ct.Cl. 561, 456 F.2d 760 (1972); *C.H. Leavell & Co., supra.* The decision will go the other way when prejudice is shown. *Eggers & Higgins v. United States,* 185 Ct.Cl. 765, 403 F.2d 225 (1968); Appeal of Linebaugh, Inc. ASBCA 11384, 67–2 BCA 6640 (1967).

In this case there was abundant evidence from which a jury could reasonably infer that ADOT had actual notice of the changed conditions and NPC's claims for compensation. Before NPC's March 16th and April 20th letters, ADOT project supervisor, Wayne Tripp, completed a study of the adverse affects of the weather on the project area. He conceded that the weather harmed and delayed the project. In the four months before these letters were sent, there were continuing discussions between NPC executives and high ranking ADOT officials about harm to the project and compensation for it. Nor did the state suffer demonstrable prejudice owing to the lack of more formal notice. It would have been impractical for the contractor to keep track of actual costs in this situation and there was a reasonable approximation of damages. (See our discussion of damages, *post.*)

## II. THE REMISSION OF LIQUIDATED DAMAGES

NPC was assessed liquidated damages pursuant to subsection 108.08 of the *Standard Specifications, supra,* which provides for such an assessment for every day of inexcusable delay beyond the contract deadline. The Tubac project was finished

97 days after the contract time, on September 13, 1979. NPC contended that this time period was excusable delay caused by the severe weather and requested a 97-day extension of the contract deadline. Subsection 108.07 empowers the state engineer to postpone the contract period to the extent that the contractor's work is delayed without his fault by circumstances that are beyond his control. NPC also requested a waiver of any stipulated damages found by ADOT. Subsection 108.07 of the *Standard Specification, supra,* provides that: "the Department may waive such portions of the liquidated damages as may accrue after the work is in condition for safe and convenient use by the traveling public." NPC submitted their claims for excuse or waiver of liquidated damages to administrative claims review by ADOT. At the highest level of administrative review, the state engineer affirmed a lower administrative decision to extend the contract for 22 days. NPC was assessed damages of $420 per day for the remaining 75 days, which totaled $31,500. The state engineer refused to waive these liquidated damages.

The trial court instructed the jury to determine whether the state engineer abused his discretion by refusing to excuse the delay or waive damages. The evidence revealed that on May 23, 1979, the contractually extended deadline for the project, the contractor was notified that several items of the work remained unfinished. The unfinished work included: 1) the installation of five flood gates; 2) the placement of guard rails; 3) the construction of chain link and line fences; 4) the erection of right of way markers; and 5) miscellaneous minor repairs. The estimated total value of the remaining items was $83,355.00. At trial, NPC argued that refusal to waive damages was capricious because sixteen days before the extended completion date, traffic was diverted onto the highways, without any detours or hindered traffic flow. NPC also asserted that because the delay was caused by an act of God beyond its control, it was an abuse of discretion for ADOT to refuse to waive damages in the absence of any serious harm caused by the delay. The jury found an abuse of discretion and refunded all the liquidated damages. The Court of Appeals reversed, holding that jury review of this decision was foreclosed in view of the state engineer's absolute discretion to refuse to waive liquidated damages.

We disagree. ADOT does not contend here that the state engineer decided this question pursuant to an arbitration or dispute resolution clause in the contract, but simply by virtue of his authority as head of the project. It is therefore a weak inference which vests absolute discretion in the state engineer merely because the contract provides that ADOT "may" waive liquidated damages.

A contracting officer with a federal agency does not enjoy this unreviewable discretion to waive liquidated damages in federal government contracts. By statute, the comptroller general or a contracting officer delegated this power may waive liquidated damages in federal government contracts involving federal or armed services agencies upon the recommendation of the head of the agency. 41 U.S.C. § 256a; 10 U.S.C. § 2312. Such decisions by the agency head or an authorized contracting officer are deemed final and conclusive. 41 U.S.C. § 257; 10 U.S.C. §§ 2310–11. This does not bar judicial review. A contracting officer's refusal to waive liquidated damages due to asserted excusable delay is judicially reviewable in the federal courts and in the various contract appeals boards if arbitrary, capricious, fraudulent, or unsupported by substantial evidence. *Marley v. United States,* 191 Ct.Cl. 205, 423 F.2d 324 (Ct.Cl.1970); Appeal of Zisken Construction Co., ASBCA 8613, 63 BCA 3829 (1963); 15 Fed. Procedure, L.Ed. § 39–348. *See generally* McBride & Wachtel, *supra,* § 34.150 (remission of liquidated damages); Calif. Government Handbook No. 22, *Government Contracts Practice* § 14.120 (remission of liquidated damages). The scope of judicial review is essentially the same for administrative decisions generally under the Administrative Review Act, 41 U.S.C. § 321 et seq. and The Contract Dis-

putes Act of 1978, 41 U.S.C. §§ 601–613. *See* McBride & Wachtel, *supra,* § 5.60 (scope of review under the Administrative Review Act); 2 A.L.R.Fed. 691 (scope of review under the Wunderlich Act) (1969); 15 Fed.Pro.L.Ed. § 39:507ff (scope of judicial review under the Contract Disputes Act of 1978). This review for lack of substantial evidence is actually broader than the abuse of discretion review involved in the present case. *Id.*

On the federal level, relief has been frequently granted from imposition of liquidated damages due to excusable delay proximately caused by unforeseeable and uncontrollable acts of God, including severe weather. McBride & Wachtel, *supra,* at § 39.50; 35.20ff; *United States v. Brooks Callaway Co.,* 318 U.S. 120, 63 S.Ct. 474, 87 L.Ed.2d 653 (1942); *Livingston v. United States,* 101 Ct.C. 625 (1944).

It is clear that contentions of excusable delay warranting remission of liquidated damages present a question of fact. McBride & Wachtel, *supra,* at § 35.20(1).

We conclude that this decision was reviewable.

We emphasize, however, that such questions are subject to only limited review. In federal practice, the equities must be strongly in the contractor's favor before remission of liquidated damages is appropriate. *See* Gantt & Breslauer, *Liquidated Damages in Federal Government Contracts,* 47 Boston U.L.Rev. 71, 82 (1967). Courts frequently uphold contractual provisions for per diem payments for delay in performance in construction contracts as liquidated damages and not penalties because they serve a worthy purpose. *See* 12 A.L.R.4th 891 (1982). Agency officials have greater expertise than courts in determining the safety impact of unfinished highway construction. Guard rails and line fences arguably promote highway safety.

We concede that courts need not defer to administrative expertise unless they are convinced that the administrator is reasonably exercising this expertise.

There is also a special potential for abuse of discretion when the state is both a party to a contract and its officials determine the private contractor's rights under the contract. *Cf. Brasel & Sims Const. Co. v. State Highway Comm'n,* 655 P.2d 265 (Wyo.1983) (highway department has no authority under the Wyoming Administrative Procedure Act to conduct hearings because party cannot act as judge in his own cause). We recognize, however, that this liquidated damages provision protects a vital interest of the state of Arizona in insuring that roads will be safe and convenient for the traveling public when they are opened for use.

Refusal to waive liquidated damages is not capricious merely because no actual harm results after a contractor inexcusably delays constructing highway safety features. Viewing the evidence favorably to uphold the jury's verdict, however, we find no error. The jury could have reasonably found that the administrator acted capriciously in refusing to remit liquidated damages because the delay was caused by an act of God beyond the contractor's control and not merely because of the apparent lack of harm owing to the delay.

## III. THE MEASURE OF DAMAGES

The jury awarded damages of approximately $201,000 in actual damages (without overhead) including the following amounts:

| | |
|---|---|
| 1. Cleaning and refurbishing medians and ditches | $ 3,500 |
| 2. Replacing eroded material in the Anamax pit lost in the flood, including costs of hauling substitute material from the Duval pit to the Anamax pit | 28,500 |
| 3. Restoring eroded and lost special backfill material | 8,000 |
| 4. Restoring mineral aggregate from new area after flooding of the Agua Linda pit | 102,000 |
| 5. Additional stripping of the Duval Mineral aggregate pit | 19,000 |
| 6. Dewatering of the Duval and Agua Linda mineral aggregate pit | 40,000 |
| | $201,000 |

The contractor kept records of the actual costs of the entire project but did not keep separate records of the actual costs of the rebuilding and rework caused by the weather, except for item # 6. The Court of Appeals reversed the award of the first five items [1] of damages due to the contractor's failure to separately document the actual costs of the additional work. This was error. We believe that the contractor made a reasonable approximation of damages in this case.

When additional work is performed on construction projects, there are traditionally at least three ways of proving costs. Specifically:

1. *Actual cost.* Keeping separate records of the actual costs of additional work is the most reliable method of qualifying costs. *Bruce Construction Corp. v. United States,* 324 F.2d 516, 163 Ct.Cl. 97 (1963).

2. *Jury verdict.* Where the contractor cannot prove actual costs, the contractor may present evidence of the cost of additional work to the finder of fact including any actual cost data, accounting records, estimates by law and expert witnesses, and calculations from similar projects. *LL. Hall Construction Co. v. United States,* 379 F.2d 559, 566, 117 Ct.Cl. 870 (1966); *Metropolitan Sewerage Comm'n v. R.W. Construction,* 78 Wis.2d 451, 255 N.W.2d 293 (1977).

3. *Total cost.* Under certain circumstances, the contractor may subtract the estimated cost or bid of the entire project from the final actual cost of the entire project. The resulting figure is the amount claimed as damages. *Moorhead Construction Co. v. City of Grand Forks,* 508 F.2d 1008, 1016 (8th Cir.1975); *Layne-Minnesota v. Singer Co.,* 574 F.2d 429 (8th Cir.1978).

Courts have resorted to the total cost method only under exceptional circumstances and then only as a last resort method. *See Huber, Hunt & Nichols v. Moore,* 67 Cal.App.3d 278, 136 Cal.Rptr. 603 (1977); the authorities cited in Rubin, *The Total Cost Method of Computing an Equitable Adjustment—An Analysis,* 26 Fed.Bar J 303, 304 n. 8 (1966). This method of measuring costs suffers from many defects. By simply subtracting the bid estimate from the cost of the overall project, the total cost method:

(a) presumes that the bid estimate was realistic;

(b) can pass along costs to the state which might have been incurred despite the act of God or the other party's breach;

(c) can reward the contractor's inefficiency, managerial ineptitude financial difficulties and other failings by passing these costs along to the state. McBride & Wachtel, § 23.70, 23.131–32.

To avoid these defects of the total cost method, NPC proposes a fourth method of measuring costs in construction contract cases.

4. *Modified total cost (or cost variance).* The original bid for a particular item of work is subtracted from the actual costs for this item of work, though both the bid and actual costs are limited and adjusted in the following manner. Damages are limited to only certain time intervals wherein the work was adversely affected by the weather. The actual costs are totaled only for these work activities affected by the weather and to only those cost accounts recording such work. The employee and machinery time used for a particular item of work is determined by reference to the superintendent's reports describing the weekly work performed, engineer's diaries, labor distribution reports, and equipment distribution reports. Actual costs

---

1. The Court of Appeals also reversed the award for the sixth item of damages, apparently due to lack of timely notice of a claim for compensation and not due to the measurement of damages. Because we found their reasoning erroneous on this score (see discussion of notice, *ante*), we reinstate this item of damages.

which were otherwise compensated or unrelated to such work activity are eliminated. The original bid estimate is redetermined in the light of the actual unit costs for the month before and after the months adversely affected. The unit cost overrun for a particular work item during the rainy months would be multiplied by the total actual work performed to arrive at the cost of rework. The adjusted estimate of the particular items of work in dispute is subtracted from the actual adjusted cost of this work only if: (1) the nature of the particular losses makes it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the contractor's bid was realistic; (3) his actual costs were reasonable; (4) the added expense was not caused by the contractor or by some cause for which he assumed the risk, but was proximately caused by the unforeseen circumstance or the other party's breach.

It is misleading to refer to this as a separate "method" for determining damages. Most courts refuse to apply the total cost method in the absence of the aforementioned circumstances. *See WRB Corp. v. United States*, 183 Ct.Cl. 409, 426 (1968); *State Highway Comm'n v. Brasel & Sims Const., supra*. Additionally, the acceptability of such a determination of damages involves a factual question as to how carefully the total cost method was modified to restrict its deficiencies. The trial judge must play an active role in this fact-bound inquiry in determining that the measure of damages is appropriate to the nature of the harm involved and that the specific estimates have been appropriately adjusted to avoid recovery of unrelated costs by the contractor.

█ The two cases cited by NPC and amici for the proposition that this constitutes a separate method for determining damages, *E.C. Ernst, Inc. v. Koppers Co.*, 626 F.2d 324 (3d Cir.1980), *on remand*, 520 F.Supp. 830 (W.D.Penn.1981), clearly state that the total cost method was being used.

*See id.* 626 F.2d at 327, 520 F.Supp. at 835. Nothing vital depends, however, on the use of terminology. We are satisfied that the modified total cost method was appropriate on the facts of the instant case.

First, a sufficient foundation for the use of the cost variance method has been established in this case. Most of the additional expenses were caused by an invisible, rising subterranean water table, so that segregating and precisely recording rework costs and original work costs was impracticable. Other cases have applied a similarly modified total method as a last resort method on similar facts. *See J.D. Hedin Construction Co. v. United States*, 171 Ct.Cl. 70, 85–88, 347 F.2d 235, 246–47 (1965) (contractor suffered weather-related damage during extended period of work caused by faulty and changed government specifications); *State Highway Comm'n v. Brasel & Sims Const., supra*, 688 P.2d at 878–79 (contractor suffered increased expenses and delay due to failure of state to supply adequate water and inferior quality of state supplied gravel); *Moorhead Construction Co. v. City of Grand Forks, supra* (excess moisture and lack of soil compaction caused additional expense and are different than represented); *Thorn Construction Co. v. Utah Dept. of Transp.*, 598 P.2d 365 (Utah 1979) (additional expense is caused contractor by inferior quality of road material and it is necessary to excavate other materials at another pit).

Because the additional work was best performed concurrently with the principal contract work, it was not feasible in this situation to quantify the actual costs of rework. *See Hensel Phelps Constr. Corp. v. United States*, 413 F.2d 701 (10th Cir. 1969).

Nor has ADOT shown that NPC's adjusted estimates of the costs of rework were unrealistic. NPC submitted the low bids on both the Tubac and Carmen projects and increased these estimates to reflect the costs actually experienced on the project. The jury obviously concluded that the weather was the cause of the contractor's

cost overruns during the months in question. NPC did keep some actual cost records where it was feasible to do so, namely, for item # 6 of the damages, the dewatering of the mineral aggregate pits.

■ NPC also contends that section 105.17 of the *Standard Specifications, supra,* imposes the burden of recordkeeping on ADOT. NPC reasons· that the state waives any requirement of actual costs for additional work if the contractor provides the state with an opportunity to keep track of costs and the state refuses this offer. The court of appeals did not find it necessary to reach this contention. We can find no persuasive authority directly on point. We need not, however, reach this contention either. It was not feasible to keep track of actual costs and there was an accurate measure of damages. We find no error with these items of damages.

■ NPC used the jury verdict method to determine damages for item # 5 of the damages, additional stripping of the Duval aggregate pit. The use of the jury verdict method is appropriate when (1) the state is liable for a changed condition that increases the contractor's expenses, (2) due to circumstances beyond his control, the claimant cannot feasibly prove specific damages by a more reliable method, and (3) when there is sufficient evidence in the record to provide a reasonable basis for approximating the damages. *See WRB Corp. v. United States, supra;* McBride & Wachtel, § 23.60(6).

■ We also believe that there is sufficient foundation for the use of the jury verdict method. Courts have approved this method of damages on similar facts. *Metro Sewerage Comm'n v. R.W. Constr., supra,* 78 Wis. at 466, 255 N.W.2d at 302 (contractor suffered increased costs due to dewatering of tunnel caused by artesian water not shown on specifications); *Foster Constr. v. United States,* 193 Ct.Cl. 587, 435 F.2d 873 (1970) (contractor caused additional expense of uncertain amount by misrepresented subsurface conditions in constructing pier). We believe that the use of the jury verdict was appropriate in this case for much the same reasons that the use of the modified total cost method was warranted. We are far from unqualifiedly endorsing either the jury verdict or the modified total cost measure of damages. The availability of both measures of damages must be proven by the contractor. Neither measure of damages can be used where there is no excuse for the failure to keep track of actual costs. *Pickard's Sons Co. v. United States,* 209 Ct.Cl. 643, 532 F.2d 739 (1976); Appeal of Soledad Enterprises, Inc. ASBCA 20376, 77–2 BCA 12757 (1977).

■ We do not believe that this is a case wherein the contractor inexcusably failed to keep track of costs because this was not feasible due to circumstances beyond his control. The case at bar is quite different from the cases cited in this respect. *Id.*

■ Nor can the contractor use the modified total cost method when there is sufficient evidence to use the jury verdict method. *See Specialty Assembly & Packing Co. v. United States,* 174 Ct.Cl. 153, 355 F.2d 554 (1966); Appeal of Drexel Dynamics Corp., 67–2 BCA 6410 (1967). The contractor cannot use the jury verdict method if he can prove only that the state caused part of the damages and cannot make a reasonable approximation of those damages. *See Electronic & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 256–57, 416 F.2d 1345, 1357–58 (1969) (contractor was caused additional expense to remove contaminated gravel, but cannot reasonably approximate government causation of damages). Even on facts where the use of both these measures of damages is appropriate, they are subject to close judicial scrutiny to insure that the contractor does not receive a windfall. We find no error, however, on the facts of this case.

IV. A.R.S. § 12–825 DOES NOT BAR ATTORNEY'S FEES OR TAXABLE COSTS AGAINST THE STATE.

Pursuant to A.R.S. § 12–348(A)(3), the trial court awarded attorney's fees, expert

witness fees and costs to appellee. The Court of Appeals reversed the trial court because it found that the award of attorney's fees fell within the prohibition against an award of "costs" against the state declared by A.R.S. § 12–825:

> If the judgment is rendered for plaintiff, it shall be for the amount actually due from the state to the plaintiff, with legal interest thereon from the time the obligation accrued and without costs.

We do not believe that A.R.S. § 12–825 bars an award of attorney's fees against the state. A.R.S. § 12–825 was first enacted by the legislature in 1912. It apparently has been interpreted by Arizona courts only twice in its long history. *Fleming v. Pima County*, 141 Ariz. 149, 685 P.2d 1301, 1308 (1984) (A.R.S. § 12–825 does not bar recovery of prejudgment interest against the state); *State v. Juengel*, 15 Ariz.App. 495, 489 P.2d 869 (1971) (taxable costs can be recovered against the state in a tort action because A.R.S. § 12–825 only bars recovery of costs against the state in contract actions involving liquidated damages).

The legislature did not intend to include attorney's fees within the "costs" prohibited by A.R.S. § 12–825. In 1912, when this statute was enacted, it would have been unthinkable to hold the state liable for attorney's fees in a civil case. "Costs" is also usually construed to exclude attorney's fees. 20 Am.Jur.2d *Costs* § 72 (1965) ("The term 'costs' or 'expenses' used in a statute is not understood ordinarily to include attorney's fees"); Stuart Speiser, *Attorney's Fees*, § 12:5 ("The term 'costs' does not embrace 'counsel fees' and there is, particularly in the United States, a well-known and long recognized distinction between costs and allowances of attorney's fees.... The term 'costs' in a statute is not ordinarily understood to include attorney's fees"). *DVM Co. v. Stag*, 137 Ariz.

466, 671 P.2d 907 (1983) ("Costs" in A.R.S. § 12–1178 does not include attorney's fees awarded pursuant to A.R.S. § 12–341.01); *Sweis v. Chatwin*, 120 Ariz. 249, 585 P.2d 269 (App.1978) (attorney's fees awarded pursuant to A.R.S. § 12–341.01 are not "costs" within the meaning of civil rule 67(d) requiring security for costs); *Coury Bros. Ranches v. Ellsworth*, 103 Ariz. 515, 446 P.2d 458, 466 (1968) ("The words 'legal costs' in a contract mean such costs as are usually recovered in civil actions and does not include attorney's fees.").

■ Additionally, although A.R.S. § 12–825 applies to this case, this statute has recently been repealed, renumbered as A.R.S. § 12–823, and amended to read as follows:

> § 12–823 **Judgment for plaintiff; amount; interest and costs**
>
> If judgment is rendered for the plaintiff, it shall be for the amount actually due from the public entity [formerly "state"] to the plaintiff, with legal interest thereon from the time the obligation accrued and *with* [formerly "without"] *court costs* (emphasis added).

The legislature amended the statute to authorize recovery for court costs against a "public entity," which is defined as "this state or any political subdivision of this state." A.R.S. § 12–820(6).[2] Assuming, arguendo, that "attorney's fees" falls within the meaning of "costs" as used in A.R.S. § 12–825, it follows that the legislature has not currently prohibited the recovery of attorney's fees from the state. The least that can be concluded is that there is no persuasive reason to extend the prohibition of A.R.S. § 12–825 against "costs" beyond the obvious meaning of this term to include attorney's fees.

We must finally determine whether A.R.S. § 12–825 bars an award of taxable costs against the state.[3] *See* A.R.S. §§ 12–331 and 12–332 (definitions of "taxa-

---

**2.** Such later amendments of a statute are not dispositive, though they do have persuasive authority. *See State v. Weible*, 142 Ariz. 113, 118–119, 688 P.2d 1005, 1010–1011.

**3.** For reasons that follow, we reverse the award of costs awarded under A.R.S. § 12–348(A)(3). However, because NPC is entitled to costs under A.R.S. § 12–341, as a prevailing party, we must reach this issue.

ble costs"). A.R.S. § 12–345, a similar statute passed by the legislature in 1912, provides in pertinent part that:

§ 12–345 **Exemption of state, county or political subdivisions**

No court costs shall be charged:

1. The state....

In *Hammons v. Waite*, 30 Ariz. 392, 395–96, 247 P. 799, 800 (1926), the court interpreted the prohibition against "costs" against the state in A.R.S. § 12–345 to exclude taxable costs. The court reasoned that it would be anomalous to believe the legislature would allow judgments against the state by waiving sovereign immunity and yet refuse to allow taxable costs:

> In all ordinary cases against other private citizens, they, as a matter of right, if successful in the action, recover the amount not only of the judgment, but of the taxable costs and expenses which they have incurred. It seems to us rather absurd that the Legislature swallowed the camel of allowing a judgment against a public body or official while it strained at the gnat of costs, and, if there is any other reasonable construction which can be given the statute, we should not hesitate to adopt it.

*Id.* at 394–95, 247 P. at 800.

In *State v. Juengel, supra,* the court adopted this same rationale as a justification for strictly construing A.R.S. § 12–825 to apply to only contract actions involving liquidated damages. The *Juengel* court arrived at this strict construction in the following manner:

> *Section* 12–825, A.R.S., is located in Article 2, Chapter 7 of our Code, which relates specifically to contract and negligence claims against the state. The section specifies the judgment shall be for the amount due with legal interest from the time the obligation accrued. Interest is only allowable as part of an award where the claim sued is liquidated. *Rossi v. Hammons*, 34 Ariz. 95, 268 P. 181 (1928). Therefore, we hold that this section applies only to contract cases involving liquidated damages.

Although we sympathize with the rationale of the *Juengel* decision, we disagree with the conclusion. It is a *non sequitur* to infer that because the prohibition against "interest" in A.R.S. § 12–825 only effectively bars claims in contract actions involving liquidated damages that therefore the bar against "costs" as used in this statute is similarly circumscribed. Even a strict construction of a statute must bear some rational relation to the purposes reasonably attributable to the legislature in enacting the law. There is no obvious reason why the legislature would want to arbitrarily disallow costs in contract actions involving liquidated damages while allowing the recovery of costs by a similarly situated class of litigants.

■ We believe that the problem faced by *Juengel* can be resolved differently. As a matter of statutory construction, there is no reason to believe that "costs" should have a significantly different meaning when used in A.R.S. § 12–825 than when used in A.R.S. § 12–345. At least, "costs" as used in A.R.S. § 12–285 could not have a broader meaning than this same term as used in A.R.S. § 12–345 because the latter statute is contained in the only chapter of Title 12 devoted to "Fees and Costs." We believe that on the authority of *Hammons*, "costs" as used in A.R.S. § 12–825 should be interpreted as excluding taxable costs. *Hammons*, even if incorrectly decided in its own time, had received almost half a century of legislative acquiescence before *Juengel* was decided. *Juengel*, by contrast, is a relatively short-lived decision. It is also a lower court decision which the legislature might reasonably have believed would be corrected on appeal. The principle of the *Hammons* decision has been repeatedly reaffirmed by later courts. *See Barry v. Arizona Dept. of Economic Security*, 25 Ariz.App. 258, 542 P.2d 1138 (1975); *Navajo County v. Four Corners Pipe Line Co.*, 12 Ariz.App. 348, 470 P.2d 496 (1970), *vacated on other grounds*, 106 Ariz. 511, 479 P.2d 174 (1970); Atty. Gen. opinion, No. 180–134. Until *Juengel* was decided, apparently no Arizona appellate court had indicated that an award of taxa-

ble costs against the state might be barred by either A.R.S. § 12–345 or § 12–825.

Even if we ignore the legislature's long-standing acquiescence in *Hammons'* construction of A.R.S. § 12–825, we believe the same conclusion follows.

As we mentioned earlier, A.R.S. § 12–825 has been amended to authorize the recovery of costs against the state. *See* A.R.S. § 12–823. Not only did the legislature fail to replace this statute with another prohibition against costs, but it amended the statute to authorize the recovery of costs against the state.[4] Even if we were to assume that taxable costs are barred by A.R.S. § 12–825, it would follow that the legislature is not currently opposed to the recovery of costs against the state. We conclude that § 12–825 does not bar an award of taxable costs against the state.

### V. THE AWARD OF ATTORNEY'S FEES UNDER A.R.S. § 12–348(A)(3).

A.R.S. § 12–348(A)(3) provides in relevant part that:

> [A] court shall award fees and other expenses to any party other than this state or a city, town or country that prevails by an adjudication on the merits in ... (3) A court proceeding to review a state agency decision, pursuant to Chapter 7, article 6 of this title, or any other statute authorizing judicial review of agency decisions.

The trial court awarded attorney's fees to appellee on the theory that his contract action against a state agency pursuant to A.R.S. § 12–821 was "any other statute authorizing judicial review of agency decisions." A.R.S. § 12–821 provides:

> Persons having claims on contract or for negligence against the state, which have been disallowed, may on the terms and conditions set forth in this article, bring action thereon against the state and prosecute the action to final judgment.

The Court of Appeals concluded that A.R.S. § 12–348(A)(3) did not apply to the case at bar and reversed the trial court. We agree

that the award of attorney's fees was improper, albeit for different reasons than are stated in the Court of Appeals opinion.

A review of the legislative history of A.R.S. § 12–348 shows that the award of attorney's fees was improper. It is frequently mentioned therein that this statute is modeled after federal legislation, The Equal Access to Justice Act, 28 U.S.C. § 2412; 5 U.S.C. § 504. It is clear that the federal statute would not provide relief on these facts, because it is limited to judicial review of formal agency adjudication as defined by 5 U.S.C. § 554, of the federal Administrative Procedure Act. This section expressly excludes agency decisions subject to *de novo* trial of the law and the facts, 5 U.S.C. § 554(a)(1). It also may be that ADOT claims review does not constitute formal adjudication for purposes of this law. *Cf. Brasel & Sims Constr. Co. v. State Highway Comm'n*, 655 P.2d 265 (Wyo.1983) (State Highway claims review does not constitute a "hearing" within the meaning of Wyoming Administrative Procedure Act); *cf.* Note, *Government Contract Disputes: An Institutional Approach*, 73 Yale L.J. 1408, 1419–20 (1964) (the federal Boards of Contract Appeals are not subject to the standards of the Administrative Procedure Act).

The narrow scope of agency proceedings whose judicial review is covered by the federal statute is explained in part by a legislative concern to keep the costs of the program at an acceptable level. *See* H.R. Rep. No. 1418, 96th Cong. 2d Sess., *reprinted in* U.S.Code Cong. & Ad.News 1980, 4953, 4993.

The Arizona statute, by contrast, is broader than its federal counterpart in this respect, because it provides awards of attorney's fees for judicial review of agency proceedings brought under the Administrative Review Act, A.R.S. § 12–901, *et seq.*, as well as for "any other statute authorizing judicial review of agency decisions." We do not believe, however, that the above-

---

4. *See* n. 2, *ante* at 197.

quoted phrase is intended to refer to A.R.S. § 12–821 or to the facts of this case.

■■■■■■ This case did not involve "judicial review of agency action" according to the conventional meaning of those terms. The court did not review the agency's decision under some limited standard of review. Rather, the court engaged in a *de novo* determination of the facts to decide if there was a breach of contract. It is true that the Administrative Review Act authorizes *de novo* review under certain circumstances, *see* A.R.S. § 12–910(B), and that *de novo* review of agency decisions is expressly authorized by some statutes. *See, e.g.,* A.R.S. § 37–134. But the instant case is simply not such a case. We do not believe that the mere fact that an agency decision precedes an action automatically transmutes the lawsuit into "judicial review of agency action" for purposes of A.R.S. § 12–348. The cause of action in this case was not created by statute, but by the common law of contracts.

The function of A.R.S. § 12–821 is strikingly similar to the federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* and the various state contract and tort claims acts. *See* the comprehensive statutes cited in the Appendix to Hanley & Wasinger, *Governmental Immunity: Despotic Mantle or Creature of Necessity?*, 16 Washburn L.J. 12, 33ff. (1976). The aim of A.R.S. § 12–821 is to abrogate sovereign immunity for all contract and negligence lawsuits against the state and to require that the claim be disallowed by the administrative agency prior to suit. If the legislature had intended to extend the scope of A.R.S. § 12–348 to every contract and negligence lawsuit against a state agency, or to every lawsuit against a state agency, they could have said so by plain language. We find their failure to do so telling evidence of their intent.

There is also evidence in the legislative history of the statute that indicates legislative concern with the broad sweep of A.R.S. § 12–348. As the bill passed the Arizona House of Representatives, there was to be recovery for fees and expenses to:

Any party other than this state which substantially prevails in a civil action in which this state is a party, including *any court proceeding to review an agency action or decision*. (Emphasis added.) H.B. 2229, 35th Leg., 1st Reg. Sess., 1981 Arizona Laws.

The above-quoted language is considerably broader than the language added in the Arizona Senate, A.R.S. § 12–348(A)(1)–(6), which replaced it in the final legislation. The Senate also added all the exclusions found in A.R.S. § 12–348(G)(1)–(9). It may be that NPC would have been entitled to recover in this case if the underlined phrase in the above quote had become the law. But A.R.S. § 12–348(A)(3), which replaced this clause in the final legislation, is considerably narrower and less vague.

We are aware that NPC suffered increased delay and expense in submitting its claim to a three-tiered ladder of administrative proceedings. We are also aware, however, that the Arizona Legislature believed that parties should bear their own expenses in administrative proceedings. A provision in H.B. 2229 for compensation of expenses incurred in administrative proceedings, comparable to a provision in the Equal Access to Justice Act, 5 U.S.C. § 504, was eliminated in the Arizona Senate before the bill was enacted into law. It is also not clear that NPC's expenses were unusual in this regard. The first two rungs in this ladder of administrative proceedings involved only the relatively informal submission of their claims to the project and district engineer. Only the final step in this review process involved a full-fledged hearing.

At any rate, in the absence of a principled stopping point, we are persuaded that we could not provide relief to NPC short of rewriting the law. We find no error.

## VI. ATTORNEY'S FEES MAY BE AWARDED AGAINST THE STATE UNDER A.R.S. § 12–341.01.

NPC requested attorney's fees under both A.R.S. §§ 12–348(A)(3) and 12–341.01.

The trial court only allowed attorney's fees under the former statute. The court refused to hear evidence of appellee's entitlement to attorney's fees under A.R.S. § 12–341.01. The one question NPC asked regarding their right to attorney's fees under this statute was received only as an offer of proof.

We disagree with the state's contention that the trial court necessarily decided that NPC was not entitled to attorney's fees when the court refused to award fees under this statute. Because there was no evidence in the record to support an award of fees under this statute, it arguably would have been improper for the court to reach this question. It is also natural for the trial court to want to avoid the discretionary determination required by A.R.S. § 12–341.01, see *Autenreith v. Norville*, 127 Ariz. 442, 622 P.2d 1 (1980); A.R.S. § 12–341.01(B), (C), rather than simply award fees by right under A.R.S. § 12–348(A)(3) to a qualified party. This case is distinguishable from *Title Insurance Co. v. Acumen Trading Co.*, 121 Ariz. 525, 591 P.2d 1302 (1979), cited by appellant. Unlike *Title Insurance*, in the present case there was no evidence to support an award of attorney's fees under A.R.S. § 12–341.01 and NPC received attorney's fees under another statute from the court.

■ ADOT also argues that NPC waived the award of attorney's fees under A.R.S. § 12–341.01 because they failed to cross-appeal the trial court's refusal to award counsel's fees under this statute. The general rule is that, in the absence of a timely cross-appeal, the appealing party cannot attack the lower court decree with a view toward enlarging his own rights under it. *Walters v. First Federal Savings & Loan*, 131 Ariz. 32, 641 P.2d 235, 239 (1982); *Maricopa County v. Corp. Comm'n of Arizona*, 79 Ariz. 307, 289 P.2d 183 (1955). We recognize that federal decisions have extended this rule of waiver to failure to cross-appeal denial of attorney's fees. 7 J. Moore, *Moore's Federal Practice & Procedure*, 204.11[3] at 934 (1973). Even if we concede that this rule applies,

however, the only issue waived on appeal is whether an award of attorney's fees is improper given the trial court's refusal to hear evidence necessary to support such an award. This is not the issue here. It would also serve only to "generate pro forma paperwork by winning litigants" to require a cross-appeal in this situation. Note, *Cross-Appeals in Maine: Pitfalls for the Winning Litigant*, 25 Maine L.Rev. 105, 112 (1973).

■ Finally, we conclude that the legislature intended to allow recovery of attorney's fees against the state under A.R.S. § 12–341.01. A.R.S. § 12–341.01(A) and (C) provides in pertinent part:

A. In *any contested action* arising out of a contract, express or implied, the court may award the successful party reasonable attorney's fees

. . . .

C. Reasonable attorney's fees shall be awarded by the court in *any contested action* upon clear and convincing evidence that the claim or defense constitutes harassment, is groundless and not made in good faith. (Emphasis added.)

An award of attorney's fees to the successful party is authorized in "any contested action" arising under section (A) or (C). This broad statutory language indicates an intent to allow recovery against all civil defendants. Allowing recovery by the state under A.R.S. § 12–341.01 would further its twin aims of mitigating the burden of the expense of litigation to establish a just claim or just defense, and discouraging frivolous lawsuits. *See* A.R.S. § 12–341.-01(B), (C); 11 Ariz.B.J. 19, 20 (1976).

The Arizona Legislature has enacted more than sixty statutes authorizing recovery of attorney's fees. *See* Rambow, *Statutory Attorney's Fees in Arizona: An Analysis of A.R.S. Section 12–341.01*, 24 Arizona L.Rev. 659, 660 n. 9 (1982). A.R.S. § 12–341.01, and to a lesser extent, § 12–348, constitute very broad exceptions to the American rule barring attorney's fees. Of the attorney's fees statutes passed by the legislature, our research discloses none

that expressly disallow recovery of attorney's fees from the state.

By contrast, there are a number of statutes which expressly forbid the state to recover attorney's fees. *See, e.g.,* A.R.S. §§ 15–542 (prevailing teacher may receive attorney's fees but state may not); 41–1481(J) (prevailing party in employment discrimination case other than state may recover attorney's fees); 12–348 (prevailing party other than state may recover attorney's fees when sued by state). This is in accord with the express legislative findings and purpose of A.R.S. § 12–348 to encourage individuals and smaller businesses aggrieved by governmental action to assert their rights. *See* A.R.S. § 12–348. This legislative declaration warrants special consideration because express legislative findings are quite rare in Arizona. See the subheading "findings" under "Legislature" in the Index to the Arizona Revised Statutes. We note that it would further this policy to allow recovery here. Nor does A.R.S. § 12–348 purport to be the exclusive statute under which the state may be liable for attorney's fees because it expressly allows recovery, "[i]n addition to any costs which are awarded as prescribed by statute" A.R.S. § 12–348(A).

Furthermore, Division One of the Court of Appeals has recently held that the state is entitled to recover attorney's fees under A.R.S. § 12–341.01. *See Lacer v. Navajo County,* 141 Ariz. 392, 687 P.2d 400 (App. 1984). Assuming without deciding that this is true, we believe there is no principled way to interpret this statute to allow the state to recover, yet create, an exception against liability in their favor. The cause should therefore be remanded to determine NPC's entitlement to attorney's fees under A.R.S. § 12–341.01.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON and FELDMAN, JJ., concur.