**Michael HATTEN, Appellant,**

v.

**UNION OIL COMPANY OF CALIFORNIA, INC. and Larry McAllister, Appellees.**

No. S–2935.

Supreme Court of Alaska.

Sept. 1, 1989.

Robert Merle Cowan, Kenai, for appellant.

Arden E. Page, Burr, Pease & Kurtz, Anchorage, for appellees.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

OPINION

MOORE, Justice.

This case involves a claim by Michael Hatten against Union Oil Company of California for intentional interference with contractual rights. On appeal, we review the superior court's grant of summary judgment in favor of Union on the ground that Union's refusal to allow Hatten to work on its oil platform was privileged.

I.

Michael Hatten operated a crane on various Cook Inlet oil rigs as an employee of Qwick Construction (Qwick). In 1979, Hatten was working as a crane operator on one of Union's platforms when the load of tools he was moving tipped and spilled into Cook Inlet. A property loss report prepared by the Union supervisor indicated that the loss was due to Hatten's negligence in failing to make sure that the load was secure before moving it. Dowell, the owner of the tools, billed Union $22,246.35 for the lost tools. Union notified Qwick, as Hatten's employer, of Union's intent to seek recovery of the loss from Qwick. Qwick filed a claim with its insurance carrier. After its investigation, which included interviewing Hatten and other employees, the insurance carrier denied the claim. In 1981, Hatten was dispatched to work on Union's platform and completed his assignment without complaints· of safety problems.

The accident claim sat in limbo until 1983 when Larry McAllister, a Union drilling superintendent, was "instructed to go around and find some of the key people that were witnesses to" the 1979 accident. Hatten stated that the tool box was not properly rigged for a crane and that the latch of the box opened, spilling the contents. Other witnesses reportedly stated that Hatten was at fault since he refused to set the load down to be retied. An internal Union audit report discounted these other witnesses' conclusions that Hatten was at fault. The report noted that the crew was relying on hand signals and that, due to noise and the position of the crane, Hatten may not have been able to hear the warnings or see the signals to set the tools down. The report also acknowledged that the tools were improperly rigged for offshore operations. Union decided to abandon the claim, due to the passage of time and because Hatten's recollection of the incident differed from the property loss report and from the statements of other witnesses.[1]

On March 2, 1986, Hatten was again dispatched to work on a Union platform. When McAllister found out that a "Mike Hatten" was dispatched, he asked Darryl Beck, another crane operator for Qwick, if it was the same Michael Hatten who had dumped the tools in the Inlet. Beck replied that it was the same man. Jim Watson, the drilling contractor, was present and told McAllister that he considered Hatten "unsafe" and "hot-headed," that he would not wear safety attire, and that he did not take instructions very well. Watson's employees work closely with the crane operator during drilling operations. Beck testified that McAllister stated that Hatten had caused him "a lot of problems, headaches and paperwork, and time."

McAllister called Qwick to request a crane operator other than Hatten. Helen Chenault, part-owner of Qwick, testified that McAllister told her that "because of the incident back in '79 that Unocal did not

---

1. Union argues that this report cannot be used as evidence of a bad motive by McAllister since there is no evidence in the record that McAllister knew of the report.· We conclude, however, that the report is relevant to the general issue of Hatten's safety record.

feel comfortable with Mike [Hatten] being on the platform."

Hatten called McAllister to question Union's decision and testified that McAllister told him that he "cost [McAllister] a lot of paperwork. Referring to the loss of tools." McAllister testified that he advised Hatten that the request for a crane operator other than Hatten was not personal, that McAllister did not know Hatten, and that information obtained as a consequence of the 1979 incident was the reason for the request. Hatten admits that he had never met McAllister.

After McAllister's request for a crane operator other than Hatten, Qwick dispatched Hatten to a crane operator's job at the Union chemical plant, where he worked for four days until the job ended. Hatten was then released by Qwick because of a lack of work.

On April 30, 1986, Hatten filed a complaint against Union and McAllister. Hatten alleged that Qwick fired him because of Union's refusal to permit him to work on its platform and that Union's actions, and those of its agent, McAllister, interfered with either (1) his employment contract with Qwick or (2) his expectancy of continuing employment in the future with either Qwick or a similar employer in Alaska's oil industry.

Union moved for summary judgment, asserting that Union's conduct was privileged, and thus not wrongful or unjustified. Judge Cranston granted the motion holding that a reasonable jury could only conclude that Union's predominate motive was the protection of its safe work place. Hatten appeals.

## II.

 In reviewing a grant of summary judgment, this court must determine whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. Alaska R.Civ.P. 56(c); *Zeman v. Lufthan-*

sa *German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985). A genuine issue of fact exists where reasonable jurors could disagree on the resolution of a factual issue. The of a factual issue. The moving party bears the burden of demonstrating the absence of any genuine issue of material fact and its entitlement to judgment as a matter of law.

*McGee Steel Co. v. State ex rel. McDonald Indus. of Alaska, Inc.*, 723 P.2d 611, 614–15 (Alaska 1986) (citations omitted).

In *Alyeska Pipeline Service Co. v. Aurora Air Service, Inc.*, 604 P.2d 1090, 1093–94 (Alaska 1979), this court held that where there is a mixed motive for interfering with contract rights, it is the burden of the defendant to show that the predominant motive was justified.[2] The court noted that:

> The question of justification for invading the contractual interest of another is normally one for the trier of fact, particularly when the evidence is in conflict. In the case at bar, the central factual issue, as to which there was evidentiary conflict, was whether Alyeska was genuinely furthering its own economic and safety interests or was using them as a facade for inflicting injury upon Aurora. There was sufficient evidence upon which the jury could properly find that Alyeska was acting out of ill will towards Aurora, rather than to protect a legitimate business interest. Alyeska maintains that its primary consideration in taking over the air transportation was safety. Aurora presented evidence that its safety record was far better than that of the Alyeska contracted aircraft that replaced it.

*Alyeska Pipeline*, 604 P.2d at 1094 (citations omitted; footnote integrated into text).[3]

Hatten argues that the trial court erred in granting summary judgment since reasonable jurors could disagree over whether Union's predominate purpose in asking for

---

**2.** *See also Bendix Corp. v. Adams,* 610 P.2d 24, 29 (Alaska 1980).

**3.** *See also United States Smelting, Refining and Mining Co. v. Wigger,* 684 P.2d 850, 860–61 (Alaska 1984).

another crane operator was safety. Hatten argues that McAllister had a personal grudge against him as a result of having to investigate the 1979 accident.

Since Hatten is the non-moving party all inferences from the evidence must be drawn in his favor. *Zeman*, 699 P.2d at 1280; *Green v. Northern Publishing Co., Inc.*, 655 P.2d 736 at 744 n. 8 (Alaska 1982); *Howarth v. First Nat'l Bank of Anchorage*, 540 P.2d 486, 490 (Alaska 1975). The trial court found as a matter of law that a reasonable jury could only conclude that safety was Union's predominate motive. The trial court concluded that "[e]ven if McAllister's statement as to Hatten's causing him a lot of paperwork was the product of malice, the addition of that type of ill will would not defeat the privilege."

 While the addition of such personal ill will as a *secondary* factor will not defeat the privilege if the predominate motive is safety, *Alyeska Pipeline*, 604 P.2d at 1093, that was not the issue before the superior court on the motion for summary judgment. The issue before the court was whether reasonable jurors could disagree over Union's predominant purpose.

 The evidence concerning McAllister's motivation in asking for another crane operator is in dispute and resolution of the issue involves questions of witness credibility. Hatten's co-employee, Beck, testified that McAllister stated that Hatten had caused him "a lot of problems, headaches and paperwork, and time." Hatten testified that when he called McAllister to question Union's decision McAllister told him that he "cost him a lot of paperwork[,] [r]eferring to the loss of tools."

On the other hand, Jim Watson, the drilling contractor for Unocal, told McAllister that he considered Hatten "unsafe" and "hot-headed," that he would not wear safety attire, and he did not take instructions very well. Hatten argues that Watson had a direct economic interest in deferring to the wishes of Unocal's drilling supervisor

and that his statements concerning Hatten's safety record are accordingly suspect. Indeed, much of the evidence concerning Hatten's safety record in general and his actions involving the 1979 accident were also in dispute.

Balancing of the evidence and weighing of witness credibility is for the jury and not the trial court on summary judgment. *See Husky Oil N.P.R. Operations, Inc. v. Sea Airmotive, Inc.*, 724 P.2d 531, 533 (Alaska 1986).

Given that all inferences from the evidence must be drawn in favor of Hatten, we conclude that reasonable jurors could disagree over whether McAllister's predominate motive was indeed work place safety.[4] Therefore, the trial court erred in granting summary judgment since a genuine issue of material fact existed as to Union's predominate motivation in requesting another crane operator. We accordingly reverse the superior court's entry of judgment and remand the case for further proceedings.

REVERSED and REMANDED for further proceedings consistent with this opinion.

---

4. Union's evidence that McAllister had not met Hatten does not necessarily lead to the conclusion that he did not hold a personal grudge against Hatten. McAllister need not have personally met Hatten in order to hold a grudge over the amount of work caused by the 1979 accident.