GEOLAR, INC., an Alaska Corporation, and Homer Electric Association, an Alaska Corporation, Appellants,

v.

GILBERT/COMMONWEALTH INC. OF MICHIGAN, a Michigan Corporation, Appellee.

HOMER ELECTRIC ASSOCIATION, INC., an Alaska Corporation,˙ Appellant,

v.

GEOLAR, INC., an Alaska Corporation, Appellee.

Nos. S–5126, S–5222.

Supreme Court of Alaska.

May 27, 1994.

Rehearing Denied July 14, 1994.*

* Justice Eastaugh not participating.

Richard H. Friedman, Friedman, Rubin & White, and William G. Royce, Anchorage, for Geolar, Inc.

Gary M. Guarino, Atkinson, Conway & Gagnon, Anchorage, for Gilbert/Commonwealth Inc. of Michigan.

Paul L. Davis, Law Offices of Paul L. Davis & Associates, Anchorage, for Homer Elec. Ass'n.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

*OPINION*

MATTHEWS, Justice.

I. *FACTUAL AND PROCEDURAL BACKGROUND*

In the mid 1980's, Homer Electric Association (Homer Electric) decided to construct an electric transmission line from Homer to Soldotna. Homer Electric hired Gilbert/Commonwealth, Inc. (Gilbert) to provide engineering and management services for the project.[1] About sixty miles of forest had to be cleared to provide a right-of-way for the line. The sixty-mile section was divided into three segments, and each segment was bid out separately. Sections two and three were completed first by contractors other than Geolar.

After sections two and three were complete, the contract for clearing section one was let out for bids. Geolar submitted the low bid and was awarded the contract.[2] The contract, drafted by Gilbert, was virtually identical to the contracts for sections two and three except that the disposal of spruce trees was modified. The contracts for sections two and three required that *all spruce* be cut into twenty-four inch segments, while all other species of trees only needed be cut into ten to fifteen foot lengths.[3] In Geolar's contract, however, Gilbert changed the specifications so that only *white spruce* was required to be cut into twenty-four inch segments. This modification is at the heart of the dispute in these cases.

Gilbert modified the spruce requirement in response to state and federal officials informing it that there was a distinction between black and white spruce. Black spruce was not affected by bark beetle, and therefore only white spruce needed to be cut into the smaller sections. Upon receiving the specifications for bid preparation, Geolar determined that the majority of spruce present in

section one were either black spruce or Lutz spruce, a hybrid of Sitka and white spruce. Geolar prepared its bid based on a determination that the hybrid Lutz spruce fell under the category of "other species," not under "white spruce," and needed only to be cut into ten to fifteen foot lengths. This assumption accounted for Geolar's low bid.

Geolar's interpretation of the contract was not known to Homer Electric or Gilbert until the parties met for a pre-construction meeting in January 1987. Homer Electric and Gilbert indicated that they disagreed with Geolar's interpretation, but agreed to investigate the matter. The parties dispute the results of the investigation. Geolar claims that Dr. John Alden, a research forest geneticist with the U.S. Department of Agriculture, informed Gilbert that Lutz spruce did predominate in the area and could be visually differentiated from white spruce. Gilbert and Homer Electric claim that forest service experts informed them that chemical analysis was the only way to distinguish the two trees, and thus considered the Lutz spruce to be covered by the contract term "white spruce."

The disagreement over the spruce requirement was never resolved by the parties.[4] Geolar claims that, rather than admit its mistake in changing the specifications without researching the species of trees present, Gilbert decided to make performance of the contract unreasonably difficult in the hopes that Geolar would back down on the spruce issue. If, instead, Geolar was forced out of business by Gilbert's actions, the breach of contract could be blamed on Geolar, and Geolar's bonding company would be forced to pay to cut the Lutz spruce.

After completing about half of the clearing required by the contract, Geolar left the job in June of 1987, claiming that Gilbert's oner-

---

1. Among other things, the contract required Gilbert to "provide control and inspection of the project," and "conduct on-site inspections of work being performed to verify conformance to the contract documents."

2. Geolar's bid ($389,000) was substantially lower than both the second-lowest bid ($576,419) and Gilbert's estimate ($526,700).

3. The reason for cutting spruce into smaller sections was to hasten the drying process of the wood, thereby hindering the spread of bark beetle.

4. Geolar offered to cut the Lutz spruce for an additional $185,000, but this offer was rejected. Even with this additional cost, Geolar's contract price would still have been the lowest bid.

ous administration of the contract had dramatically increased Geolar's costs and made it impossible for Geolar to proceed further. Homer Electric then made a claim against Geolar's performance bond issued by Balboa Insurance Company (Balboa). Balboa paid approximately $389,000 to have the contract completed.

In March 1989 Geolar filed suit against Homer Electric and Gilbert, alleging a variety of claims. Homer Electric counterclaimed for breach of contract. In November 1991 Homer Electric and Gilbert filed motions for summary judgment and dismissal of claims. In response, Geolar dropped all claims except (1) breach of contract against Homer Electric and (2) intentional interference with contract against Gilbert. The superior court granted summary judgment for Gilbert and dismissed Geolar's claim for intentional interference with contract. The breach of contract claim against Homer Electric went to trial and a jury verdict was returned in Geolar's favor for $981,952. Homer Electric's counterclaim was rejected. Geolar appeals the summary judgment in Gilbert's favor, and Homer Electric appeals the jury verdict in Geolar's favor.

## II. DISCUSSION

### A. Geolar's Intentional Interference with Contractual Relations Claim [5]

In order to decide whether the superior court erroneously granted Gilbert's motion for summary judgment, we must decide two issues: (1) when, if ever, can an agent be held liable for interfering with a contract between its principal and a third party; and (2) if an agent can be held so liable, are there genuine issues of material fact in this case concerning whether Gilbert tortiously interfered with the contract.

We have defined the elements of the tort of intentional interference with contractual relations to be

proof that (1) a contract existed, (2) the defendant ... knew of the contract and intended to induce a breach, (3) the contract was breached, (4) defendant's wrongful conduct engendered the breach, (5) the breach caused the plaintiff's damages, and (6) the defendant's conduct was not privileged or justified.

*RAN Corp. v. Hudesman*, 823 P.2d 646, 648 (Alaska 1991) (quoting *Knight v. American Guard & Alert, Inc.*, 714 P.2d 788, 793 (Alaska 1986)). The dispute in this case centers on the sixth element: whether Gilbert's conduct was privileged or justified.

■ The specific question of whether an agent can be liable for intentionally interfering with a contract between its principal and a third party is one of first impression in this court. We have, however, dealt with the issue of privilege to interfere in other business relations. In *Bendix Corp. v. Adams*, 610 P.2d 24, 31 (Alaska 1980), we recognized that a parent corporation may have a privilege to interfere in contractual relations between its subsidiary and a third party. We also recognized the right of a landlord to interfere with his tenant's lease assignment contract in *RAN*, 823 P.2d at 649. In both cases we focused on the fact that the interfering party had a direct financial interest in the contract at issue. *Bendix*, 610 P.2d at 31; *RAN*, 823 P.2d at 649. Once we determined that the interfering party possesses a direct financial interest in the contract

the essential question in determining if interference is justified is whether the person's conduct is motivated by a desire to protect his economic interest, or whether it is motivated by spite, malice, or some other improper objective.

*Bendix*, 610 P.2d at 31, *quoted in RAN*, 823 P.2d at 649–50.

A different, but related, test applies in determining whether an agent is privileged to interfere with a contract between its prin-

---

**5.** "In order to be entitled to summary judgment, the moving party must establish that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." Whether summary judgment was warranted is a question of law we will review de novo. We will review the facts in the light most favorable to the non-moving party.
*Farmer v. State*, 788 P.2d 43, 46 n. 8 (Alaska 1990) (quoting *Bethel Utils. Corp. v. City of Bethel*, 780 P.2d 1018, 1020 (Alaska 1989)) (citations omitted); *see also* Alaska R.Civ.P. 56(c).

cipal and a third party. Restatement (Second) of Torts § 770 (1979) provides:

> One who, charged with responsibility for the welfare of a third person, intentionally causes that person not to perform a contract or enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if the actor
>
> (a) does not employ wrongful means and
>
> (b) acts to protect the welfare of the third person.

The commentary to section 770 states that it is applicable "in the case of agents acting for the protection of their principals." *Id.* § 770 cmt. b. An agent's own financial interest, as distinct from that of its principal, is not a basis for privileged interference unless the financial interest is in the nature of an investment in the principal. Restatement (Second) of Torts § 769 cmt. c. As Homer Electric's agent, Gilbert was privileged to interfere with Homer Electric's contract with Geolar only if it acted to protect Homer Electric's best interests. The essential question, therefore, is whether Gilbert's actions were predominately motivated by a desire to protect Homer Electric's interests or by spite, malice, or some other improper objective. *See Waldinger Corp. v. CRS Group Eng'rs, Inc.,* 775 F.2d 781, 790 (7th Cir.1985) ("Where a conditional privilege exists, the plaintiff to succeed on a claim of tortious interference with contract, must allege and prove that the agent's intentional acts were not taken to further its principal's best interests, but to further its personal goals or to injure the other party to the contract.").

**6.** *See also* 45 Am.Jur. *Interference* § 27 (1969) ("It is generally held that the question whether there was justification for procuring a breach of contract or interfering with another's employment is for the jury.").

**7.** Gilbert argued in the summary judgment context that Geolar's claims against it should have been dismissed for the same reasons that Homer Electric now argues. As the arguments are identical, we address them only in the context of Homer Electric's appeal.

**8.** Our role in reviewing a denial of a motion for a directed verdict and a J.N.O.V. "is to determine whether the evidence, when viewed in the light

■ We have clearly stated that "[t]he question of justification for invading the contractual interest of another is normally one for the trier of fact, particularly when the evidence is in conflict." *Alyeska Pipeline Serv. Co. v. Aurora Air Serv., Inc.,* 604 P.2d 1090, 1094 (Alaska 1979).[6] In the case at bar, Geolar argues that Gilbert's motive for onerously enforcing the contract was not a desire to protect Homer Electric's economic interests. Rather, Gilbert was motivated by an improper objective: to force Geolar to breach the contract, thereby masking Gilbert's mistake in modifying the spruce cutting requirement. There is evidence in the record to support Geolar's contention, and reasonable jurors could disagree over Gilbert's predominant motive. As all reasonable inferences must be drawn in Geolar's favor as the non-moving party, *Hatten v. Union Oil Co.,* 778 P.2d 1150, 1153 (Alaska 1989), the question of whether Gilbert's conduct was predominately motivated by a desire to protect Homer Electric's interest was one for the jury, and summary judgment was improperly granted.

#### B. Geolar's Breach of Contract Claim [7]

Homer Electric's arguments on appeal boil down to essentially two issues: (1) Geolar did not provide sufficient evidence to prove Homer Electric breached the contract; and (2) Geolar did not prove damages with reasonable certainty. Homer Electric advances these arguments in the context of the trial court's denial of Homer Electric's motions for summary judgment, directed verdict, J.N.O.V., and a new trial. We address these issues in turn in the context of the applicable standards of review.[8]

most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment as to the facts." *Mullen v. Christiansen,* 642 P.2d 1345, 1348 (Alaska 1982).

"The grant or refusal of a motion for a new trial rests in the sound discretion of the trial court, and we will not disturb a trial court's decision on such a motion except in exceptional circumstances to prevent a miscarriage of justice." *Buoy v. ERA Helicopters, Inc.,* 771 P.2d 439, 442 (Alaska 1989).

Finally, in reviewing a trial court's denial of a summary judgment motion, we "determine whether there is a genuine issue of material fact and whether the moving party deserves judgment

### 1. Breach of Contract Claim

At trial, Geolar claimed Homer Electric breached its contract by (1) failing to make timely payments; (2) requiring work not reasonably called for in the contract; and (3) breaching the implied covenant of good faith and fair dealing. The jury specifically found that Homer Electric breached the contract in these three ways. We address each in turn.

#### a. *Failure to make timely payments*

Homer Electric discusses only two incidents of a "failure to pay." In both cases, Homer Electric claims that payments were not made because work units were incomplete or not completed according to the approved construction schedule. Geolar presented extensive testimony from George Thomas, Geolar's vice-president and field supervisor, and Larry Lockyer, co-owner of Geolar and a civil engineer who, in the performance of his consulting duties for Geolar, was involved in the monitoring of construction activities, disputes and claims.

Both men testified to various instances where Homer Electric refused to physically accept legitimate pay requests, delayed payments owed, and refused pay requests for previously approved work unless further work was first completed. Lockyer also testified to a letter conditioning payment owed to Geolar on release by Geolar "of all claims by Geolar, both known and unknown, pertaining to this project."

#### b. *Requiring performance not reasonably called for in the contract*

Homer Electric argues that the work Geolar was required to do was specifically set out in the contract, and it therefore had a right to require such performance. Geolar presented testimony and evidence concerning four virtually identical contracts: the two contracts for clearing sections two and three, Geolar's contract, and the contract of the company that replaced Geolar. The testimony indicated that the specifications in the contracts were enforced rigidly against Geolar, but not against any of the other three contractors.[9] Geolar also presented objective evidence to the jury consisting of photographs and videotape of the completed work in the three sections.[10]

#### c. *Failing to deal fairly and in good faith*

The trial court's instruction on the issue of good faith and fair dealing stated that the duty can be violated by

> dishonest conduct, such as conjuring up a pretended dispute, or by asserting an interpretation of the contract contrary to one's own understanding.... or abusing the power to determine contract compliance or to specify terms of performance.

Homer Electric does not claim the instruction was erroneous, but argues that the evidence Geolar presented was insufficient to

as a matter of law." *Criterion Ins. Co. v. Velthouse*, 751 P.2d 1, 2 (Alaska 1986).

**9.** Geolar presented evidence that (1) in previous contracts "limbing" was interpreted to mean cutting off all branches sticking up around the trunk of a felled tree (approximately 180 degrees around), while Geolar was required to cut 360 degrees around, necessitating the rolling over of each felled tree; (2) in previous contracts felled trees that were to be left parallel with the center line were left scattered, while Geolar was forced to use a compass to measure the angle of the logs to ensure compliance; (3) the prohibition of stacking logs in the contract was not enforced at all in sections two and three but was enforced against Geolar strictly; and (4) a requirement that stumps be no more than six inches high was enforced strictly against Geolar while stumps on sections two and three were left anywhere from eighteen inches to four feet high.

**10.** Homer Electric also argues that it was error for the trial court to admit evidence that at a pre-bid meeting, the contractor who had worked on section two stated in response to a question regarding the level of performance required that a review of the work he completed on section two would demonstrate the level of work required on section one. Homer Electric objected to this testimony on the basis of hearsay and argues that the trial court abused its discretion in admitting this evidence. The court admitted this evidence as relevant to Geolar's representatives' state of mind. As such, the evidence was not hearsay because it was not admitted to prove the truth of the matter asserted. Alaska R.Evid. 801(c). Homer Electric was entitled to a limiting instruction explaining this to the jury. Alaska R.Evid. 105. However it did not ask for such an instruction.

show bad faith on Homer Electric's part.[11] As set out above, Geolar presented evidence that the pay disputes and interpretation and enforcement of the contract terms fit this description. This was sufficient evidence for the jury to find bad faith on Homer Electric's part.

### d. *Conclusion*

■ On each of the theories supporting its claim of breach of contract, the evidence Geolar presented was sufficient to support the jury's finding that Homer Electric breached its contract. Therefore we affirm the trial court's denial of Homer Electric's motions for summary judgment, directed verdict, J.N.O.V., and a new trial.[12]

### 2. Award of Damages

#### a. *Geolar's increased cost of performance*

The jury awarded Geolar $118,964.00 for "increased costs of performance resulting from being required to perform work not reasonably required by the contract, or as a result of delays in payment." Homer Electric argues that Geolar failed to prove that Homer Electric's breaches caused Geolar's damages; failed to prove the amount of these damages with sufficient specificity; and improperly relied on the total cost method of calculating damages, which this court views with disfavor. *See Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148, 155 (Alaska 1992); *Anchorage v. Frank Coluccio Constr. Co.*, 826 P.2d 316, 325 (Alaska 1992); *Fairbanks North Star Borough v. Kandik Constr.*, 795 P.2d 793, 798–99 (Alaska 1990), *reh'g granted on other grounds*, 823 P.2d 632

(Alaska 1991). Geolar responds that the method it employed was not a total cost method, and that, even if it was, the jury's award should be affirmed as the jury's verdict was in *Coluccio Constr.*, 826 P.2d at 327–28.

■ We must first decide whether Geolar's method of calculating its damages for increased costs of performance is equivalent to a total cost method. The total cost method calculates damages by determining the difference between the actual costs incurred on a project, plus a reasonable amount for profit, and the contract price. *See Kandik Constr.*, 795 P.2d at 798. Geolar's witnesses did not employ this exact formula to calculate Geolar's damages. Instead, Geolar's estimates of its damages contained three elements: direct costs, loss of efficiency costs, and delay costs. The direct costs component contained actual additional expenses that Geolar claimed to have suffered on account of Homer Electric's breach. These fixed costs resemble a partial "actual costs" damage calculation. This court has expressed a preference for the "actual costs" method, even where this method might not identify all losses. *Coluccio Constr.*, 826 P.2d at 325, 326. The remaining two elements of Geolar's calculations—loss of efficiency and delay costs—involved estimating how long Geolar should have taken to complete a given amount of work under its original estimates; comparing this amount of time to the amount of time the work actually took to complete; and multiplying the difference by the cost of labor, equipment, supervision, and overhead

---

**11.** In a pre-trial order, the trial judge ruled that Homer Electric's failure to renegotiate the contract, refusal to submit to arbitration, and refusal to adopt Geolar's definition of "white spruce," could not be construed as independent breaches of contract. He did rule, however, that "evidence concerning those actions may be admissible for plaintiff's claim for breach of the obligation of good faith and fair dealing."

Homer Electric contends that it was error for the trial court to allow the jury to consider these actions or inactions as evidence of breach of good faith. Homer Electric does not indicate what evidence, specifically, it is objecting to. Nor is there any evidence or claim that Homer Electric objected to the introduction of such evidence at trial. The issue is thus waived. Alaska R.Evid. 103(a) ("Error may not be predicated

upon a ruling which admits ... evidence unless a substantial right of the party is affected; and ... a timely objection ... appears of record.").

**12.** We judge the denial of Homer Electric's motion for summary judgment on this issue by the evidence before the superior court at the time of the motion. The trial court had before it the affidavits of David Pennington, a professional engineer, Larry Lockyer, a civil engineer for Geolar, and George Thomas, vice-president and field supervisor for Geolar. The facts in these three affidavits, taken in the light most favorable to Geolar, create genuine issues of material fact as to all three of Geolar's claims. Thus we affirm the denial of Homer Electric's motion for summary judgment on this issue.

per unit of time. Upon analysis, we find that these elements of Geolar's claim are essentially modified expressions of the total cost method.

The central aspect of both the total cost method and Geolar's loss of efficiency and delay claims is a comparison between the contractor's initial estimates and the actual cost of performing the contract. In the traditional total cost method, the contractor's initial estimates are represented by its bid price, and reasonable profit is added to the actual costs incurred to reflect the fact that the bid price itself most likely included some margin of profit. Geolar's method merely substitutes actual time for actual cost, and uses its expected rate of production rather than its bid price to represent its initial estimates. Theoretically, at least, Geolar's method and the total cost method should reach the same result, if properly applied.[13]

In addition, Geolar's method does not alleviate any of the problems that cause us to disfavor the total cost approach. We have stated that the flaw in the total cost method is that "it assumes that the defendant's breach was the cause of all of the extra cost."

*Kandik Constr.*, 795 P.2d at 798 (quoting *U.S. Indus. v. Blake Constr. Co.*, 671 F.2d 539, 547 (D.C.Cir.1982)). This may be broken down further. The total cost method "assumes plaintiff's costs were reasonable[,] . . . that plaintiff was not responsible for any increases in cost, and . . . [that] plaintiff's bid was accurately computed. . . ." *Id.* (quoting *F.H. McGraw & Co. v. United States*, 131 Ct.Cl. 501, 130 F.Supp. 394, 400 (1955)). Any or all of these assumptions may be wrong in a given case. Like the total cost method, Geolar's method assumes that all deviations from the expected course of performance resulted from the defendant's breach. Therefore, Geolar's method of calculating damages must be at least as disfavored as the total cost approach.[14]

■ Although we disfavor the total cost method, we have not absolutely prohibited its use.[15] We must therefore decide whether the use of a method akin to the total cost method, such as Geolar's approach, was appropriate, and correctly applied, in this case.

We have previously indicated that a four-part test must be met before the total cost

**13.** If the cost per unit of time is calculated accurately, it should be the same for both the estimated time the contract should have taken absent breach and for the total amount of time actually taken. Therefore Geolar's method ((actual time − expected time) × cost per unit of time) may be restated as actual cost (actual time × cost per unit of time) minus expected cost (expected time × cost per unit of time). Similarly, if we assume that the price paid used in calculating damages under the total cost method equals the expected cost of performance plus the profit expected, the total cost method (actual cost + reasonable profit − price paid) may be restated as actual cost plus reasonable profit minus expected cost minus expected profit. Assuming the expected profit was reasonable, Geolar's method and the total cost method are mathematically equivalent.

**14.** In fact, we find Geolar's method of calculating its loss of efficiency and delay claims to be *less* reliable than the total cost method. Because Geolar's method relies on estimates both of the expected cost of performing a given amount of work and of the cost per additional unit of time, instead of the actual cost and the bid amount, more room for disguised mathematical error exists. This is evidenced by Geolar's own presentation, which estimated damages at a minimum of $172,000, although its actual total costs for the work performed were, at most, $257,000. If

Geolar's damage claim was calculated correctly, then it only expected to spend $85,000 in order to earn almost $186,000.

Because additional costs caused by a breach may be awarded even if a project would not have been profitable to a contractor had there been no breach, and because lost profit claims in cases of this nature are closely scrutinized, (*see* section II.B.2.b, *infra*) lost profits should be separately identified in presenting damage claims to the jury. Similarly, separately identifying such claims in the jury's verdict through the use of a special verdict or interrogatories is often useful.

**15.** In *Conam Alaska*, 842 P.2d at 154–57, we upheld the trial court's refusal to submit the plaintiff's claims for damages from professional negligence to the jury. The plaintiff had sought to rely on a total cost theory. After stating that "the policy disfavoring the total cost approach is based on the lack of proof of proximate cause," we reviewed the evidence, and concluded that "cause remained too speculative to submit the issue of damages . . . to a jury." *Id.*, at 155, 157. In *Kandik Constr.*, 795 P.2d at 799, we set aside a jury verdict based on total cost evidence because the trial court erroneously "refused to give the jury any specific instruction which would have enabled the jury to limit the award of damages to those proximately flowing from the . . . breach of contract."

method may be used to prove a contractor's damages:

> The acceptability of the method hinges on proof that (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses.

*Coluccio Constr.,* 826 P.2d at 325 (citations omitted). "The burden of proving that each prong is met is on the contractor." *Id.* (citing *New Pueblo Constructors, Inc. v. State,* 144 Ariz. 95, 696 P.2d 185, 196 (1985)). This test governs both the admissibility of evidence of total cost calculations and the application of the total cost method by the finder of fact. *See Nebraska Pub. Power Dist. v. Austin Power, Inc.,* 773 F.2d 960, 968 (8th Cir.1985).

The question of admissibility is for the court. Alaska R.Evid. 104. Therefore, the trial court bears the initial responsibility of determining whether there is sufficient evidence to create a question of fact regarding whether the requirements of this test could be satisfied. *Id.* In making this determination, the trial court should closely examine the proffered evidence to insure that each element of the test can be satisfied. The total cost method remains in disfavor and is properly used "only as a last resort method." *New Pueblo Constructors,* 696 P.2d at 194. In addition, the first element of the test—the impossibility or impracticability of other means of calculating losses—raises, in part, the legal question of what measure of damages is appropriate. Even after the trial court makes the initial determination to admit evidence of the total cost method, it must carefully control the use of that evidence. As the Supreme Court of Arizona has stated:

> The trial judge must play an active role in this fact-bound inquiry in determining that the measure of damages is appropriate to the nature of the harm involved and that the specific estimates have been appropri-

ately adjusted to avoid recovery of unrelated costs by the contractor.

*Id.* at 195.

In the present case the trial court's obligation to determine the suitability and admissibility of Geolar's damage calculations arose on Homer Electric's motions for summary judgment on the issue of damages and, in the alternative, for a protective order preventing Geolar from introducing its total cost evidence at trial. On review, we conclude that the trial court correctly denied these motions. First, no means other than the total cost method for measuring Geolar's damages for having to perform additional work "not reasonably called for in the contract" has been identified.[16] Second, drawing all inferences of fact in its favor, Geolar submitted evidence which, if accepted, was sufficient to prove that Geolar's estimate was realistic, that its actual costs were reasonable, and that it was not responsible for the additional costs it sought to charge to Homer Electric. Thus, the total cost method appears to be the only reasonable means of calculating Geolar's damages and there are genuine issues of material fact concerning the final three elements of the four-part test. The trial court properly denied Homer Electric's motions against Geolar's use of a total cost method.

The trial court erred, however, in admitting total cost evidence without subjecting it to controls to prevent it from being misused. If the jury is allowed to hear evidence of damages calculated under a total cost method, then it must be instructed not to apply the method unless all four factors are established. *See Coluccio Constr.,* 826 P.2d at 328 (approving instructions which specifically instructed jury not to apply the total cost theory unless four factor test was met). In addition, because the basic flaw with the use of the total cost method is that it assumes causation, we also require that the jury be instructed not to award damages unless the plaintiff proves that the defendant's breach caused them. *Id.; Kandik Constr.,* 795 P.2d at 799. Regardless of whether Geolar's version of the total cost

---

16. On remand, the trial court is free to re-examine this issue and attempt to identify another means by which Geolar could reasonably be expected to prove its damages.

method satisfied this test in the present case, the trial court erred in failing to instruct the jury on the proper use of this evidence after allowing the evidence to be heard. Remand for a new trial on the issue of damages is therefore necessary.[17]

b. *Lost profits on the uncompleted portion*

■ The jury awarded Geolar $44,400 for loss of profits on the uncompleted portion of the contract. Homer Electric contends that the award was speculative as there was insufficient evidence from which the jury could arrive at this amount. We agree.

"In order to recover lost profits in a breach of contract action, the plaintiff must present to the jury evidence sufficient to calculate the amount of the loss caused by the breach." *City of Palmer v. Anderson,* 603 P.2d 495, 500 (Alaska 1979). The only testimony concerning lost profits for the unfinished portion of the contract was presented by Dave Pennington, Geolar's expert. He testified that to calculate lost profits, he simply determined the value of the work to be done in the second half of the project and from that the total contract earnings for that portion of the contract. From these figures he was able to determine the mark-up on the balance of the contract. At no time did Pennington provide any figures for the calculations he made. He concluded by testifying that the lost profits for the second half of the contract were $87,000.

Considering Lockyer's testimony that he estimated gross profits for the *entire* project to be $100,000 to $150,000, Pennington's estimate of $87,000 in net profits from only half

the contract is suspect. The jury's decision to award $44,400, or only slightly more than fifty percent of Pennington's estimate, does not remedy the problems with this award. Geolar's evidence is too speculative to support an award of lost profits. "[L]ost profits must be proven with reasonable certainty." *Guard v. P & R Enters. Inc.,* 631 P.2d 1068, 1072 (Alaska 1981). Because Geolar had no prior experience with contracts of this size and complexity, its own estimates, offered without proof of how they were reached, are unreliable. "The evidence must afford sufficient data from which the court or jury may properly estimate the amount of damages, which data shall be established by facts rather than by mere conclusions of witnesses." *City of Whittier v. Whittier Fuel & Marine Corp.,* 577 P.2d 216, 223 (Alaska 1978) (quoting *Levene v. City of Salem,* 191 Or. 182, 229 P.2d 255, 263 (1951)), *disapproved on other grounds in Native Alaskan Reclamation & Pest Control v. United Bank of Alaska,* 685 P.2d 1211, 1219 (Alaska 1984).

Geolar offered no evidence of its own profit margins on other projects, nor did it offer evidence of the profits obtained by other contractors performing similar jobs, such as the replacement contractors. *See Guard,* 631 P.2d at 1072–73 (noting that a business without an established profit history might rely on its principals' profit history on similar jobs or on the profit history of others similarly situated).[18]

In addition, the great difference between Geolar's bid and the other bids submitted on this contract[19] underlines the need for reliable evidence concerning lost profits. While

17. We recognize that, although Homer Electric consistently has claimed that Geolar's damage calculations employed the total cost method, it did not specifically request the additional instructions we require. Instead, it argued that the total cost method should be totally rejected. Because we hold that the total cost method may be submitted to the jury under certain limited circumstances, we must reject Homer Electric's argument. Nevertheless, allowing a jury to utilize a version of the total cost method without requiring it to first find that the four-part test we adopted in *Coluccio Constr.* was met causes a substantial injustice. Remand is therefore required.

We decline to consider whether the jury's award is supportable as a "jury verdict" in the

absence of instructions, like those given in *Coluccio Constr.,* 826 P.2d at 328, which properly limit consideration of the total cost method.

18. It is doubtful in the present case whether either Geolar's own profit history or the profits obtained by other contractors would have been sufficient indicators of Geolar's profits on the Homer Electric contract, given Geolar's inexperience in jobs of this size and the difference in price between Geolar's bid and the prices charged by the other contractors.

19. The next lowest bid was $576,419 and the third lowest bid was $930,000.

we recognize that Geolar's bid was apparently based, in part, on a substantially different interpretation of the white spruce bucking requirement, the spruce issue was never resolved; therefore Geolar still bore the risk that the issue would be resolved in Homer Electric's favor. Under the circumstances of this case, Geolar's estimates of its expected profits are entirely too speculative to support an award of lost profits.

### c. *Loss of value of business as a going concern*

■ The jury awarded Geolar $400,000 for the loss of value of Geolar as an operating business. In order to award damages for the loss of the business, the jury was instructed that it first must find that Homer Electric had reason to foresee the loss as a probable result of the breach at the time that the contract was made. *See Native Alaskan Reclamation & Pest Control,* 685 P.2d at 1219. Homer Electric argues that the award was not a foreseeable loss and, in the alternative, that the verdict was not supported by sufficient evidence.

As a result of the bid process, Homer Electric was aware of Geolar's financial status. Paul Taylor, Geolar's economist, testified that with this knowledge, Homer Electric clearly had notice that if it breached the contract in a material way, Geolar would go out of business. It was also foreseeable that a claim would be made against Geolar's bonding company, resulting in a suit brought by the bonding company against Geolar and Geolar's inability to conduct business as a construction company. Sufficient evidence was provided to support the jury's determination that the loss was foreseeable.

The amount of the jury's verdict, however, is not supported by sufficient evidence. Taylor testified at length as to the valuation of Geolar as an operating business. Ultimately, he concluded that the business had a value of between $271,000 and $451,000. Geolar failed to prove, however, that it lost what Taylor valued. Taylor's value range represented an estimate of what a willing buyer might be expected to pay for Geolar in an asset sale transaction—that is, to purchase all of Geolar's productive assets, including

equipment and intangibles, without assuming any of its liabilities. In order for Taylor's valuation to accurately reflect Geolar's loss, Geolar needed to prove that it lost, without receiving any value in exchange, all that it would have given up in such an asset sale, including its equipment and intangibles. Geolar did not establish these losses. In particular, Geolar failed to establish that it lost any equipment. The equipment carried a book value of $307,000, which George Thomas testified was a conservative estimate. In the absence of proof that this equipment was lost as a result of Homer Electric's breach, Taylor's testimony cannot support a damage award for the loss of Geolar's ability to function as an operating concern.

We also note that Taylor's valuation method is not the proper means of measuring the losses sustained when a company is forced out of business. Geolar's true loss, if any, is the difference between its net value when it was in operation and its net value after ceasing operation. Taylor valued only part of one half of this calculation, and therefore his testimony is not sufficient to support an award for the loss in value of Geolar. The award of damages for the loss of the value of the business is reversed.

### d. *Damages for judgment owed to Balboa*

■ After Geolar left the job in June 1987, Homer Electric filed a claim with Geolar's bonding company, Balboa. Homer Electric collected $389,000 from Balboa, which was used to pay another contractor to complete the project. Balboa subsequently sued Geolar for this sum plus interest and attorney's fees. As the principal on the bond, Geolar was liable to its surety, Balboa, for the amount paid. Before the suit went to trial, Balboa and Geolar entered into a settlement agreement whereby Geolar agreed to pay Balboa $400,000. Geolar was to pay Balboa out of one-third of any recovery in the suit against Homer Electric.

The jury awarded Geolar $400,000 for the judgment owed to Balboa. Homer Electric argues that the damage claim against Homer Electric for the $400,000 should not have been considered by the jury because (1) the

settlement did not create an actual liability on the part of Geolar; and (2) inclusion of the claim was prejudicial to Homer Electric.[20]

Under the terms of the bond and the indemnity agreement. between Geolar and Balboa, Geolar was obligated to indemnify Balboa for all claims which Balboa, in its sole discretion, paid. The settlement agreement, which compromised Balboa's right to this payment and determined the manner in which Balboa would be paid, is a valid and enforceable agreement. In *Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin*, 828 P.2d 745, 763 (Alaska 1992), an injured plaintiff entered into a covenant not to execute on a judgment against the defendant pending the defendant's suit against a third party. We rejected an argument by the third party that, because of the covenant not to execute, the defendant had not suffered a loss and therefore could not bring a suit for damages. *Id.* We noted that a failure by the defendant to pursue the litigation against the third party diligently would be a material breach of the agreement with the injured plaintiff, in which case the plaintiff could execute on the judgment. *Id.* Similarly, Geolar agreed to pursue its claim against Homer Electric, and any failure to do so would be a material breach of the agreement with Balboa. Thus Geolar has suffered a loss it may pursue against Homer Electric.

■ Homer Electric waived its argument that the inclusion of the Balboa claim was prejudicial as it informed the jury of third party claims and thus encouraged the jury to increase the damage award. Not only did Homer Electric not object to this evidence at trial, Homer Electric's counsel was the one who initially brought up the settlement

agreement in cross-examination of Lockyer. Counsel's argument that "admission of the settlement documents improperly allowed the jury to consider Geolar's attorneys' fees and costs, and Geolar's outstanding SBA loan, in calculating damages" is groundless considering he moved for admission of the documents. Thus the jury award for the judgment in favor of Balboa should be affirmed.[21]

### e. *Conclusion* [22]

We reverse the damage awards for lost profits for the unfinished portion of the contract, for loss of the value of Geolar as a going concern, and for the increased costs of performance. The damage awards for the judgment due the bonding company and retainage are affirmed.

## III. *CONCLUSION*

An agent has a qualified privilege to interfere with a contract between his principal and a third party as long as he is predominantly motivated by a desire to protect his principal's economic interest. Whether Gilbert was so motivated is a factual question for a jury. Thus we REVERSE the trial court's grant of summary judgment for Gilbert.

We AFFIRM the trial court's denial of Homer Electric's motions for summary judgment, directed verdict, J.N.O.V. and a new trial. The damages awarded for retainage and the judgment in favor of the bonding company are AFFIRMED. The damages awarded for lost profits for the unfinished portion of the contract, for the loss of Geolar as an operating business, and for Geolar's increased cost of performance are RE-

---

**20.** Homer Electric also argued that there was insufficient evidence to support the award and that, alternatively, the award should be reduced to reflect the fact that Balboa is to receive payment out of one-third of Geolar's recovery. Neither of these arguments has merit. The settlement agreement was introduced and there was testimony on the issue. Homer Electric at no time objected to the insufficiency of the evidence at trial. A reduction in the award is also not required. Geolar is entitled to that amount of damages which it owes Balboa, based on the jury's determination that Homer Electric breached its contract with Geolar.

**21.** Homer Electric raises several arguments in its reply brief that it did not previously discuss. As these issues were not addressed in either appellant's or appellee's briefs, they are waived. Alaska R.App.P. 212(c)(3).

**22.** Homer Electric also argues that the $18,587 Geolar was awarded for retainage by Homer Electric should be reduced by the $10,651 Homer Electric paid to repair trails damaged by Geolar. This argument is without merit. This amount was asserted as a breach of contract in Homer Electric's counterclaim and was specifically rejected by the jury.

VERSED. This case is REMANDED for further proceedings consistent with this opinion.

BURKE, J., not participating.