**MATANUSKA ELECTRIC ASSOCIATION, INC.,** Appellant,

v.

**Rowland Scott WATERMAN, Appellee.**

No. S–10828.

Supreme Court of Alaska.

March 26, 2004.

Kyle W. Parker and David J. Mayberry, Patton Boggs LLP, Anchorage, for Appellant.

Peter J. Maassen, Ingaldson Maassen, P.C., Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Rowland Waterman sued Matanuska Electric Association, Inc. (MEA) after the Board of Directors refused to seat a successful candidate for the Board of Directors because of alleged campaign disclosure violations. The superior court granted Waterman's motion for summary judgment, concluding that under the MEA bylaws the MEA Board was not permitted to refuse to seat a successful board candidate. MEA appeals the superior court's judgment. Because the superior court correctly interpreted the MEA bylaws, we affirm its ruling.

## II. FACTS AND PROCEEDINGS

### A. Factual History

Matanuska Electric Association, Inc. (MEA) is a public utility cooperative that is managed by a seven-person board of directors. In the spring of 2001 three Board seats came up for election. Two incumbent directors, Rose Marie DePriest and Linda Shattuck, sought reelection, while there was no incumbent for the third seat. Michael Janecek and Mae Tischer both ran for the open seat. Janecek received 119 votes more than Tischer in the election. DePriest and Shattuck were both reelected to the Board.

On April 9, 2001, the Board met to certify the election results and to seat the winning candidates. At this meeting, one participant expressed concern about Janecek's campaign disclosures, suggesting that Janecek's advertising cost more than his disclosure statements revealed. At the same meeting, Stephen Ellis, MEA's counsel, questioned Janecek about the contents of his disclosure report as well as his contributions and expenditures. The meeting was then continued to April 30 so that the campaign disclosures of all of the winning candidates could

be reviewed. None of the successful candidates were seated at the April 9 meeting.

There are four campaign-finance reports described in the "Election 2001 Candidate's Handbook": a pre-election report which must be filed ten to twenty days prior to the April annual meeting; a post-election report which covers the period after the filing of the pre-election report and must be filed within twenty days after the April annual meeting; a year-end report for all of 2001; and a correction report. The correction report is described in the handbook as an opportunity for a candidate to provide any information that is missing:

> If a candidate fails to fully disclose the information required by MEA, he will be notified by the Board of Directors of the actions needed to fully comply—for example, to correct any erroneous campaign finance report. The candidate will be asked to file a **Correction Report.** The Board will specify the period this report should cover. The **Correction Report** must be filed within 30 days after the candidate receives notice of the Board's request for the report.

On April 26 Janecek filed two reports: a timely post-election report and a correction of his pre-election report. In his correction report, Janecek disclosed a $6,400 invoice for a mailing performed by North Mail. His post-election report also included advertising expenses with the *Frontiersman* newspaper.

The MEA Board meeting resumed on April 30, 2001. Apparently Ellis had conducted an investigation of the candidates in the interim although the April 9 meeting transcript makes no mention of any request for such an investigation. Ellis asked that the Board go into executive session to consider the findings of his investigation. Directors Lester and Cottle objected to going into executive session, but Ellis responded that he expected the findings to be made public after the executive session. There is no record of what occurred in the executive session.

When the regular session resumed, the Board adopted the findings of fact set forth in Ellis's investigation report. Ellis then orally summarized the contents of his report, describing his findings for each candidate. Ellis found several irregularities for DePriest and Shattuck, but he described each of these as "minor," "in good faith," and "correctable." No objection was raised to seating these two successful candidates on the Board, and subsequent to Ellis's review, each was sworn in.

Ellis then summarized his findings about Janecek. He identified a failure to disclose $1,935 in ads placed by Janecek in the *Frontiersman* and described this as a violation that could "not be cured or corrected." Ellis concluded that there were "aggravating factors" making Janecek's explanation for the omission not "credible." Ellis also identified a mailing expense of $6,400 that was not disclosed when it was accrued. Ellis described Janecek's other violations as minor and correctable.

After Ellis completed his report, Board President William Folsom opened the floor for discussion. Although one board member asked whether Janecek or his attorney would have an opportunity to respond to Ellis's findings, Folsom maintained that Ellis's report was based on Janecek's disclosures. Immediately thereafter, a motion was made that Janecek be found in violation of the MEA bylaws and thus not be seated on the Board. Before the vote, Janecek repeatedly requested to be heard, only to be told by Folsom that the Board was not hearing "anything further from the public." The Board then voted 5–2 not to seat Janecek. By a 5–2 vote, Tischer, Janecek's opponent, was seated in Janecek's stead. Before Tischer was seated, Ellis pointed out Tischer's own disclosure irregularity but described it as in "good faith."

During the meeting, Directors Lester and Cottle made clear their dissatisfaction with the actions of the Board. Lester criticized the Board's action on the basis that all three candidates had violated the bylaws which, according to Lester, should have prevented them all from being seated.

## B. Procedural History

In May 2001 Rowland Waterman, an MEA member who had voted for Janecek, filed suit

against MEA alleging violations of the bylaws, the Open Meetings Act, and the Alaska Constitution and seeking to compel the Board to seat Janecek. Waterman also sought a temporary restraining order (TRO).

Superior Court Judge Peter A. Michalski was temporarily assigned the case during Superior Court Judge Beverly W. Cutler's absence. After a hearing, Judge Michalski denied Waterman's request for a TRO.

Following discovery, both sides filed motions for summary judgment on Waterman's various claims. On February 7, 2002, Judge Cutler heard oral arguments on the summary judgment motions. Judge Cutler granted Waterman's motion for summary judgment on two grounds, concluding that the Board had violated section 11 of its bylaws when it refused to seat Janecek, and that MEA was estopped from enforcing its campaign disclosure regulations against Janecek because Janecek relied on MEA's disclosure forms and fully completed them. Judge Cutler also found that Waterman was a public interest litigant and awarded him full reasonable attorney's fees of $100,000.

Final judgment was entered on September 10, 2002, and the Board seated Janecek at its next regularly scheduled Board meeting on March 11, 2002. MEA appeals the superior court's decision to grant summary judgment in Waterman's favor.

## III. STANDARD OF REVIEW

We review a superior court's grant of summary judgment de novo.[1] Under that standard, we determine whether any genuine issue of material fact exists and whether the movant "is entitled to judgment on the law applicable to the established facts."[2] We view the facts in the light most favorable to the non-movant, drawing all factual inferences in favor of the non-movant.[3]

## IV. DISCUSSION

### A. The Superior Court Correctly Concluded That the Board Had Violated Its Bylaws by Refusing To Seat Janecek.

█ MEA argues that the superior court erred when it substituted its judgment for that of the Board and overturned the Board's decision not to seat Janecek. It contends that the business judgment rule applies and protects the Board's reasonable decision. Judge Cutler rejected MEA's claim that the Board's actions were reasonable and relied instead on the plain language of the bylaws. The trial court concluded that "the board had no discretion not to seat [Janecek]."

### 1. The relevant bylaws

Section 11 of the MEA bylaws is entitled "Campaign Disclosure," with section 11(g) and (i) controlling the treatment of candidates' campaign disclosure violations. Section 11(g) requires the Board to give candidates an opportunity to correct disclosure violations, while section 11(i) allows the Board to refuse to seat a candidate who does not make the corrective disclosure required by section 11(g). The relevant sections provide:

The following provisions of this bylaw apply to Board candidates who campaign for a seat on the Board of Directors. The Board shall adopt policies and prescribe such forms for the implementation of this section as the Board shall deem necessary.

. . . .

(g) Any candidate who fails to fully disclose the information required to be filed with the Association as stated in sections (a), (b), (c), (d) and (e) above shall be notified in writing by the Board of the actions needed to fully comply and shall be given thirty (30) days from the receipt of notice to make the disclosure or file the appropriate report.

. . . .

**1.** *Martinez v. Ha,* 12 P.3d 1159, 1161 (Alaska 2000).

**2.** *Id.; Geolar, Inc. v. Gilbert/Commonwealth Inc. of Michigan,* 874 P.2d 937, 941 n. 8 (Alaska 1994).

**3.** *Martinez,* 12 P.3d at 1162.

(i) A candidate who is found by the Board to be in violation of this section shall not be seated by the Board of Directors, and if seated shall be immediately removed from the Board by the Board if the candidate or Board members fails to make the disclosure required in (g) above, as provided by Article IV, Section 3.

## 2. Bylaw interpretation

MEA argues that the Board was simply doing its job by addressing violations of the campaign disclosure regulations. MEA relies on the managerial power granted to the Board by statute[4] and its own bylaws,[5] as well as the authority granted in the bylaws to regulate campaign disclosures[6] and to adopt policies for the implementation of MEA's campaign disclosure bylaws.[7] MEA further argues that Waterman's interpretation of the bylaws "would effectively render MEA's campaign disclosure rules a nullity." MEA contends that there are certain serious campaign disclosure violations that cannot be cured with the filing of a post-election correction report[8] and that it is the Board's duty to distinguish such violations from those that are less serious.

In *Afognak Native Corp. v. Olsen,* we recognized that a board's interpretation

of a corporate bylaw is not necessarily conclusive.[9] The rules of contract interpretation apply to the interpretation of by-laws[10] and include avoiding interpretations that create conflict among provisions.[11]

MEA's position ignores the plain language of the bylaws. Section 11(i) states that "a candidate ... in violation of [§ 11] shall not be seated ... *if the candidate ... fails to make the disclosure required in (g)."* (Emphasis added.) Section 11(g) provides that "any candidate who fails to fully disclose the information required to be filed ... shall be notified in writing by the Board of the actions needed to fully comply and *shall be given thirty days from receipt of notice to make the disclosure or file the appropriate report."* (Emphasis added.) Taken together, these sections create a system whereby a candidate is to be notified of any disclosure violations and given thirty days to cure the violation. If, and only if, a candidate fails to provide such a cure is the Board permitted to refuse to seat that candidate. This procedure parallels the procedure described in article IV, section 3(e),[12] which permits the Board to remove a board member when there is a violation that has not been corrected under section 11(g). Having been verbal-

---

4. "The business of a cooperative shall be managed by a board of not less than five directors, each of whom shall be a member of the cooperative or of another cooperative which is a member of it." AS 10.25.140.

5. "The business and affairs of the Association shall be managed by a board of seven (7) members which shall exercise all of the power of the Association except such as are by law, the Articles of Incorporation or these Bylaws, conferred upon or reserved to the members." MEA Bylaws Art. IV, § 1.

6. MEA Bylaws Art. IV, § 11(i).

7. "The Board shall adopt policies and prescribe such forms for the implementation of this section as the Board shall deem necessary." MEA Bylaws Art. IV, § 11.

8. MEA describes Janecek's violations as "uncurable." While it might make sense to permit only pre-election "cures," the MEA bylaws do not contain this requirement. Judge Cutler found that Janecek fully filled out all of the forms. The Campaign Disclosure Statements provided by MEA only ask for various types of contributions.

The court concluded that there was no space on the forms to indicate advertising that was hired out by the candidate and not yet billed by the advertiser since it is not a "contribution." We need not resolve the question whether the forms estopped MEA from enforcing the additional disclosure requirements.

9. 648 P.2d 991, 992 (Alaska 1982).

10. *Storrs v. Lutheran Hosps. & Homes Soc'y of America, Inc.,* 609 P.2d 24, 30 (Alaska 1980); *see also McMillan v. Anchorage Community Hosp.,* 646 P.2d 857, 862 (Alaska 1982).

11. *Storrs,* 609 P.2d at 30.

12. Article IV, section 3(e) of the MEA Bylaws states:

Upon establishment of the fact that a board member is holding the office in violation of any of the foregoing provisions or in violation of Article IV, Sections 11(a), (b), (c), (d), (e) and not corrected under Section 11(g), the Board shall remove such board member from office.

ly notified at the April 9 Board meeting of concerns regarding his campaign disclosures, Janecek filed a correction report within thirty days. Janecek thus made a curative disclosure and satisfied all of the requirements of section 11(g).

The plain language of the bylaws prevents the Board from using its discretion to determine whether a candidate should be disqualified due to campaign disclosure violations. And the bylaws are based on solid policy. As Waterman notes, unfettered Board discretion to decide when a campaign disclosure violation merits refusing to seat a successful candidate would permit the Board to "refuse to seat a winning slate of reform candidates" or to choose not to seat its challengers. In *Grimm v. Wagoner,* we considered whether financial disclosure violations required a state senate candidate to forfeit an election.[13] We reasoned that minor errors in disclosure did not interfere with the public's ability to judge the candidates;[14] we instead emphasized the harm of "thwart[ing] voter intent" by depriving voters of the representatives they elect.[15] The same concern arises here when a board is authorized to overcome the will of the members by selectively seating candidates. Rather, pursuant to section 5 of the bylaws, entitled "Removal of Board Member by Members," it is the members who "bring charges for cause" and who vote on the "question of the removal of such board member."

MEA's reliance on the business judgment rule is misplaced because a plain reading of the bylaws, and Janecek's undisputed compliance with the correction report requirements of section 11(g), leave no discretion to the Board to refuse to seat Janecek. Therefore, we affirm the superior court's grant of summary judgment in favor of Waterman.

## V. CONCLUSION

Because the superior court correctly concluded that the Board violated its own bylaws by refusing to seat Janecek, we AFFIRM the superior court's determinations.

EASTAUGH, Justice, not participating.

---

**13.** 77 P.3d 423 (Alaska 2003).

**14.** *Id.* at 432.

